The opinion of the court was delivered by
Nicholls, C. J.
This suit was instituted by Lewis Oliff, W. C. Vance and Tames M. Foster, averring themselves to be individually and severally, property holders and taxpayers to the City of Shreve *1205 port, and averring, also, that each of them had likewise large business interests in the Parish of Bossier.
In (heir petition they represented that they, in attending to their business interests in Shreveport and Bossier Parish, had need frequently to pass over the bridge constructed across the Red river at a point in the corporate limits of the City of Shreveport.
That the bridge was constructed by the Vicksburg, Shreveport and Pacific Railway Company, in conjunction with the City of Shreveport and Bossier Parish, under and by virtue of the agreement embodied in the following ordinance of the City of Shreveport, to-'wit:
“Be it ordained by the Council of the City of Shreveport, in legal assembly convened, that the City of Shreveport, in the State of Louisiana, in connection with .the police jury of the Parish of Bossier, State of Louisiana, desiring that the bridge crossing Red river, at Shreveport, to be built by the Vicksburg, Shreveport and Pacific Railroad Company, shall be made available for the passage of road wagons and foot passengers, make, and enter into the following agreement, with Otto Plock, president of said railroad company, to-wit:
“1. The said City of Shreveport, and Parish of Bossier, party of the first part, will pay unto said railway company, party of the second part, seven per centum-per annum interest on the increased cost of constructing said bridge, so as to make the same available for road vehicles and foot passengers, including in said cost the cost of all structural additions which may be necessary to make saiil bridge so available; this payment shall be made semi-annually, and the same shall be due to the party of the second part by the party of the first part, for each and every year of the duration of this agreement. This agreement shall operate perpetually, and the bridge shall forever be used for the. passage of road vehicles and foot passengers.
“2. Said party .of the second part shall undertake and be responsible for the maintenance of the said bridge and approaches thereto in first-class order and condition at all times. The expenses incurred by such maintenance and inspection of said bridge shall be charged to the party of the first part, and the party of the second part, respectively, in proportion to the nature of the work, and said party of the second part shall furnish to the said party of the first part, monthly, an itemized statement showing details of the sums chargeable to said party of the first part.
*1206 “3. That in the matter of painting said bridge, the expenses thereof shall be pro rated between and paid by the parties hereto, respectively, in proportion to the increased cost entailed by the requirements by the said party, of the first part. Such cost of painting shall be charged to the said party of the first part, upon a certified voucher therefor, and the payment thereof by said first party, under the agreement, shall be made in twelve equal' consecutive monthly installments, the balance not bearing interest.
“4. 'That said party of the first part shall pay a proportion of the taxes and insurance payable on said bridge, and the approaches thereto, in accordance with the relative costs of the bridge, as originally designed by said party of the second part, and the cost of said bridge, as now desired by said party of the first part.
“5. That the tolls shall be collected by, and be received by, said party of the first part, and it shall be obligatory upon said first party that the revenues arising from the collection of said tolls shall, after all deductions properly chargeable thereto for expenditures by the said party under this agreement shall have been made, be applied to a reduction of the ferry tolls for the ensuing year, and that said reduction shall be at the rate of ten per centum from the existing rates, and at a rate not exceeding ten per centum for each succeeding year upon the rates charged during each preceding year. It is further agreed that the surplus revenues accruing, under this agreement, shall not be applied to any other purpose than the reduction of the ferry tolls, and the extinguishment of the debt for the construction of said bridge.
“6. That the said party of the first part shall undertake the full responsibility for collecting the tolls, and the said party of the first part shall maintain and keep all vehicles and foot passengers off the bridge on the approach of trains, and also at any time when the second party's bridge tender shall advise said guard or guards that the' load-way and footway must be closed either for railroad purposes or for the passage of boats, said guard or guards Jiall work in unison with the said bridge tender, and in accordance with his requirements. Said guard or guards shall also obey and carry out the general and special instructions and rules prescribed by said second party so far as the duties attending the working of draw and other bridges are concerned. *1207 “7. That the said party of the first part will take immediate action, at the request of the party of the second part, in all matters of irregularity on the part of their guard or guards.
“8. That the trains and locomotives of the said party of the second part shall, at all times, have precedence of all other vehicles or passenger traffic.
“9. That, as regards the existing ferry, the said party of the first part undertakes, on and from the opening of the said bridge, to abandon forever all rights to institute a ferry, or lease ferry privileges, and will undertake to assist and protect said party of the second part in any matter of claim, or any legal action, which may arise under the abandonment of said ferry privileges.
“10. That the said party of the first part hereby undertakes to do and perform any and every act which may be necessary to remove any obstacles which may be interposed with a view to impede the construction of a bridge across the Red river, as designed by the said party of the second part, and agrees to do whatever structural or other work may be necessary to provide as good facilities as now exist, for the furtherance of business other than that of said party of the second part.
“11. That the said party of the first part will take whatever action may be necessary to give legal form and strength to this agreement, and will pass the necessary ordinances and regulations therefor.
“12. That should any fault arise on the part of the party of the first part in paying the sum due to the party of the second part, then, within sixty (60) days after the date of sending in the monthly statement of accounts, as heretofore described, the said party of the second part shall have the right to step in and appropriate to its own uses and purposes the tolls chargeable for the passage of road vehicles and foot passengers over the bridge, and the right so to do is hereby expressly surrendered to the said party of the second part, by the said party of the first part, in eases of default in said payments or any of them by the said party of the first part. If, however, after the party of the second part has made avail of the foregoing conditions and possessed itself of the right to collect and’take possession of the tolls, it shall be the privilege of the party of the first part to give ten days notice of its intention and ability, and to pay up all the arrears due, to which «TinU be added interest at the rate of ten per centum, per annum, of the *1208 amount of said arrears, and after such notice has been given to the party of the second part, and the sum of money due properly tendered to said party of the second part, then shall the party of the first part be entitled to enter upon the collection and possession of the tolls, with the obligation of observing the conditions of this agreement, as hereinbefore expressed, the same as if no default had been made.
“13. It shall be the privilege of the party of the first part to pay the party of the second part the sum incurred by the party of the second part, in consequence of the requirements of the party- of the first part, at any time, and after such payment shall have been made then shall the party of the first part be only bound to pay, in proportionate, part of the expense of repairing the roadway and approaches of the bridge.”
They aver that the said bridge was completed and opened to traffic in July, 1884 — that R. N. McKellar is -the duly elected and acting Mayor of the said City of Shreveport, a municipal corporation, chartered under the acts of the Legislature of 1878; that, since the completion of said bridge, the said City of Shreveport, and said Parish of Bossier, have levied and collected a toll from foo-t, horse, and vehicle passengers, over said bridge, according to the following schedule of rates, to-wit:
For each vehicle and driver of 6 animals ................50 cents
For each vehicle and driver of 5 animals..................45 cents
For each vehicle and driver of 4 animals..................40 cents
For each vehicle and driver of 3 animals..................35 cents
For each vehicle and driver of 2 animals..................30 cents
For each vehicle and driver of 1 animal............'......20 cents
For each animal and rider................................10 cents
For each person on foot or passenger in vehicle............05 cents
For each head of loose cattle, horses or mules..............05 cents
For each head of other loose stock........................05 cents
—that said schedule of toll thus levied and collected remained unchanged until the year when another schedule of rates was adopted and enforced, which said last mentioned rates of toll remains to this day without further changes or reduction, but the same are still being daily exacted and collected from all persons passing over said bridge; that the toll thus collected under the first schedule of toll rates, *1209 amounted to twenty-five thousand- ($25,000.00) dollars annually, and that under the last named schedule, above referred to, amounted to $20,000.00 annually that from the beginning' of-the collection of tolls, as aforesaid, to the present time, the said City of Shreveport has received for, its share of said collections the full sum of one hundred and fifty thousand dollars ($150,000.00), which said sum has been received by tlie said City of Shreveport, and passed into its treasury, to the credit of the bridge fund; that the portion of the price of constructing ■said bridge, which said city agreed ito pay, as set forth in the ordinance above mentioned, was fully paid from its tolls collected under, and by virtue -of, said ordinance before the year 1888; that since the completion of the payment of the price of construction by the said City of Shreveport, as above referred to, said eiity has collected from the tolls exacted from passengers over said bridge the full sum of -one hundred thousand dollars ($100,000.00), which said sum is -an ample fund to pay said city’s share of repairs, etc., for all time, and of which said sum petitioners have paid as toll collected from them, as passengers over said bridge, more than two thousand dollars annually, and are still paying said sum, though under protest; that said City of Shreveport never had, alt any time, any lawful warrant or authority for collecting any toll whatever from persons passing over said bridge, and that all such exactions are unlawful, and impose on petitioners, and all persons passing over said bridge, a tax for which exists no warrant of law; that said bridge is a public highway, and the public has a right to use it; that the right to collect tolls for passage over public highways belongs exclusively to the State; that municipal corporations have no power or right to exact such tolls without express legislative authority, and that no such power has ever been delegated by the State to the City of Shreveport; that the collection of said tolls is restrictive of, and injurious to, the City of Shreveport, in which petitioners are taxpayers, and in the growth and trade of which petitioners in common, with other taxpayers of said city, have an interest.
That if the ordinance of the City of ‘ Shreveport constituted any lawful authority for the collections of tolls over said bridge, which petitioners deny, that the tolls, as at present collected, are in excess of the authority granted in said ordinance, and to that extent unlawful, and without proper warrant of law.
*1210 That the furthei collections oi said toll, in imposing oil petitioners an unlawful exaction of money for the privilege of passing over said bridge, which is a public highway, is an unwarranted obstruction of said public highway, injurious to the rights of petitioners and all other taxpayers of said City of Shreveport, and that to prevent the further collection of said tolls, a writ of injunction is necessary.
In view of the premises they prayed a writ of injunction issue, restraining the said City of Shreveport from the further collection of any tolls whatever from petitioners or any other persons passing over said bridge, upon themselves, animals or vehicles, and that said City of Shreveport be duly cited, and that on final hearing petitioners have judgment making said writ of injunction perpetual, and prohibiting said City of Shreveport from any further collection of said tolls.
They prayed for all orders needed in the premises, for costs, and foi general relief.
Upon reading this petition the court ordered the defendant to show cause why the order prayed for should not be granted.
The defendant, appearing solely in answer to the rule nisi, and reserving all exceptions and defenses to be made thereafter, showed as reasons why the preliminary injunction prayed for should not be granted:
1. That it appeared that the suit involved the rights of other parties, (defendant) who had not been joined therein.
2. That the petition showed no cause of action.
3. That even if proper parties were impleaded, and a prima facie cause of action appeared, no cause was shown for the preliminary injunction.
Denying that its action in the matter complained of was in any way contrary to law, defendant prayed to be dismissed from the rule nisi, and that all its rights to áppear in the future in excepting to, or answering the suit, bé reserved, and for general relief. Without prejudice to the exceptions theretofore made, and under reservation of all legal rights, defendant answered.
After pleading the general issue, the city admitted that it was collecting tolls from those using the bridge across the Red river, at Shreveport, constructed by the Vicksburg, Shreveport and Pacific Railroad Company, and averred that tolls so collected were collected under authority of law, and in accordance with ordinance of the City *1211 of Shreveport, legally enacted. That such tolls were reasonable and just, and necessary for the maintenance of said bridge. ;
It prayed that plaintiffs’ demand be rejected and their , suit dismissed.
The District Court sustained the exception of non-joinder, with leave to plaintiffs to amend, and make the Parish of Bossier, and the Yicksburg, Shreveport and Pacific Railroad Company parties defendant.
Lewis Oliff and W. C. Yance having- died, Mrs. Jennie Oliff, as, universal legatee and heir of Lewis Oliff, and Mrs., Nina Yance, Widow W. O. Yance, Larry W. Yance, and Miss Estelle Vancq, daughter of W. C. Yance, as widow in community, and heirs of W. C. Vance, made themselves parties to the suit and, joining with James M. Foster, filed therein an amended petition in which, after adopting and reiterating- the allegations of the original petition, they further averred that the Parish of Bossier joined with..said City of Shreveport, and said Railway Company, in the construction of the bridge across Red river, referred to in original petition, under and by virtue of the agreement embodied in an ordinance, regularly passed by the police jury, of said Parish of Bossier, a duly certified copy of which said ordinance was filed; that said Railway Company agreed to the-contracts embodied in the two ordinances passed and adopted by the said City of Shreveport, and said Bossier Parish, respectively; that since the beginning of collection of the tolls, as set forth in their original petition, Ithe Parish of Bossier had received with the City of Shreveport an equal share of the tolls collected, and continued to the present time thus to receive its equal share of said tolls; that the portion of ithe price of construction of the said bridge which the City of Shreveport and the Parish of Bossier agreed to pay, as set forth in the> ordinance embodying the contract, was fully paid from the tolls collected under and by virtue of an ordinance before the year 1888 • that the said Parish of Bossier was, at Ithe time of entering into the contract, embodied in the said ordinance, and still was, without any authority, in law, to make or enter into any such contract, and further, that if the said ordinance passed by ithe Police Jury of said Parish of Bossier, constituted any lawful authority for the collection of tolls for passing over said bridge, averred that the tolls, as at present collected, were in excess of the authority granted in said ordinance, and to that extent unlawful and without any proper warrant; that said Railway *1212 Company had no authority to establish a toll bridge such as that contracted for in the ordinances adopted by >the City of Shreveport and the Parish of Bossier, referred to; that if the contracting parties had any authority to construct and establish the toll bridge provided for in aforesaid ordinance, it was plainly the intent of said contracting parties, as shown by their contract, embodied in said ordinance, 'that the toll should be progressively reduced until said bridge should be practically free from tolls, and in conformity with that intention, the Parish of Bossier did declare in favor of abolishing the tolls and withdrew from the parish end of said bridge the toll collector, and for the space of some weeks refrained from the collection of toll for crossing said bridge; 'that the City of Shreveport, and the Parish of Bossier, still persisted in collecting toll from parties crossing over said bridge according to the rates, or schedule, fixed in their original contract, as embodied in the two ordinances aforenamed, notwithstanding they had collected in excess of the price of construction and maintenance, all of which had long been paid, a large sum equal to at least $100,000, a sum sufficient to maintain all needed repairs on said bridge for all time, and that a writ of injunction was necessary to restrain the further collection of tolls.
In view of the premises, they prayed for a writ of injunction to issue, restraining the Parish of Bossier and said Railway Company from any further collection of tolls from parties passing over said bridge, and that the Parish of Bossier and said Railway Company be cited, and on final hearing petitioners have judgment making said writ of injunction perpetual, and prohibiting ifchem from any further collection of tolls’ for passing over said bridge.
They prayed for all orders needed in the premises, for all costs of suit, and for general relief.
The Parish of Bossier excepted to the jurisdiction of the court, but the exception was overruled. It then filed a motion praying that the court order the plaintiff's to elect whethér they sue to annul the contract or to enforce the same, and that on failure so to do, the suit be dismissed, urging that the demands were inconsistent and contradictory.
The Vicksburg, Shreveport, and Pacific Railway Co., answered. After pleading the general issue, it admitted that the City of Shreveport, and the parish of Bossier, entered into a contract attached to the *1213 petition with respondent, and that its co-defendants complied with their obligations thereunder, to a period as alleged, when the enhanced cost of the structure, resulting from the change of plan necessary to carry into effect the purposes of the contract, was reimbursed to respondent, as far as demanded.
That since that time, respondent had tacitly acquiesced in the appropriation by the city of Shreveport and the parish of Bossier, of the surplus revenues arising from the tolls on the bridge, after meeting their obligations to share in the cost of maintenance and reconstruction of the bridge, as far as demanded by respondent; and while it might be true, that its co-defendants may have appropriated the surplus revenues, to other purposes than that fixed in the contract, not having any special interest in the enforcement of this provision, and being unwilling to appear as an obstruction to public improvements, iit had acquiesced as aforesaid; that under the terms of the contract it would be impracticable to abolish tolls altogether, as the current liability of the city of Shreveport, and the parish of Bossier,- for the care, maintenance, and renewals of the bridge, amounted annually to more than two thousand ($2,000) dollars, which under the contract, they had a right to reimburse respondent, out of the surplus tolls, besides their contribution to the reconstruction of the span destroyed some time since, and which was then in course of erection and being replaced, which would amount to about three thousand ($3,000) dollars.
That should the bridge be declared free to the public, it would destroy the means of the city and parish provided for its share of the maintenance, taxes, etc., and would result in serious inconvenience to respondent, by crowding the bridge with onerous and unlimited traffic, and hinder its efficient use by respondent, in the operation of its trains; that while the tolls on the bridge might be reduced largely, for the reasons stated, it would impair the contract to make the bridge absolutely free to the public, and would therefore work an injustice to all the parties to the contract.
In view of the premises respondent prayed that the demand for an injunction be denied, and that there be judgement in its favor for costs, etc. But in the event 'that the court undertook equitably to adjust the tolls, on the said bridge, under the contract, that the same be not so much reduced as to destroy the means provided for in the contract, by which its co-defendants might discharge their obligations, to respondent.
*1214 The Parish of Bossier answered. After pleading' the general issue, it admitted the contract with the Vicksburg, Shreveport and Pacific Railway Company, and that that parish and the city of Shreveport, were collecting tolls over the bridge mentioned in plainltiff’s petition, and it averred their right and power to make said contract, and collect said'tolls.
It excepted that plaintiff’s petition disclosed no cause of action, and specially denied that plaintiffs, private individuals, had the right to bring the suit, as they were not privy to the contract, nor had they the right to enforce the same. It prayed that the suit be dismissed.
The city of Shreveport filed exceptions- — ■
1. That the plaintiffs’ petition disclosed no cause of action.
2. That plaintiffs, private individuals, alleging the usurpation by the city of Shreveport and parish of Bossier, of a public franchise or power, in which they, plaintiffs, had no interesit, except as they might have in common with the public, and by which they were not affected, except áo far as they might he affected in common with the public, had no right, or legal cause to complain of such alleged usurpation, which could be controlled or prevented only by action of the Sítate.
3. That the State and the plaintiffs had acquiesced in and recognized the right and power of the city and parish aforesaid, to collect and exact tolls for crossing the bridge specified in plaintiffs’ petition, for and during a period of more than thirteen years, and by such long acquiescence in, and recognition of, the right of said city and parish to collect tolls as aforesaid, both the State and plaintiffs were barred from maintaining any action, having for its object, the deprivation of the franchise or power, so acquiesced in, and recognized.
It prayed that the action be dismissed.
The following admissions were made by the parties—
“1st.. It is admitted — That plaintiffs are large tax payers in both Bossier and Caddo parish, and in attending to their business interests as plantérs and brick manufacturers, have need to frequently pass over the bridge, and pay tolls annually amounting to $
2. That the Red river bridge was constructed and built by the V., S. & P. R. R. Co., under the agreement with defendant city and Bossier parish, set up in petition, as shown by ordinances of city and parish, and was completed and opened to traffic in June, 1884, which agreement and ordinances have been amended and modified, as shown by ordinance of city June 17, 1892, pp. 133-4, City Ordinances.
*1215 3. That tolls were charged for the use of said bridge, ■ from said opening to -, according to schedule of rates set forth in petition, and from-, to this date, ás per this schedule, and that the collectors of said tolls, are agents and employees of the defendant city and Bossier parish, and that they exacted tolls from plaintiffs and others, passing over the bridge, according to said schedule, both night and day, in accordance with ordinances of the city and parish duly adopted.
4. That annual tolls amounted to $-- under first schedule, and $-under second schedule, were collected by said city and parish.
5. That the portion of the price of constructing said bridge, assumed by said defendants (1-7) was (fully) paid in January, 1888, out of tolls already collected.
6. That since that time tolls have been collected to the amount of $-, which has been.equally divided between the defendants, city and parish. But that all funds arising from such tolls remaining after the necessary amounts for bridge purposes were used for bridge purposes, were appropriated and disbursed by said city and parish for internal improvements, as per receipts and disbursements admitted. (Subject to objection by plaintiffs as to admissibility.)
7. It is admitted for purposes of trial of this case, that plaintiffs, if present, would testify that they pay an annual aggregate in tolls in passing over the bridge, amounting to $2100.00, and that their use of it is for legitimate and usual purposes, and in due course of their business as planters and brick manufacturers.
8. That Red river is a navigable stream.
9. That the bridge as constructed, constitutes the only passage way for foot, vehicles, and horse travel, from east of Red river to Shreveport, and that it connects the important highways on the east and west of Red river.
10. That there are no ferries operated across Red river, at or near Shreveport, and have not been, since the completion of the bridge so built by the railroad company.
11. It is admitted the expenses incurred in employment of collectors, providing houses for them, sweeping and cleaning bridge, compensation of officers of city and parish charged with duty of making monthly settlements with collectors, and other incidental expenses, aggregate $2300 annually.
*1216 The District Court rendered' judgment, by which it was ordered, adjudged and decreed that the city of Shreveport, and the parish of Bossier, and the Vicksburg, Shreveport and Pacific Railway Company be enjoined and restrained from collecting any greater amount of tolls for passage on the bridge of said railroad at Shreveport, than might be necessary to maintain the same, pursuant to the original and supplemental contracts, made between said city and parish and said railway company, and thalt defendants pay all costs.
The parish of Bossier and city of Shreveport appealed.
Appellees prayed in the Supreme Court that the judgment appealed from be amended so as “to restrain the defendants and appellants from exacting any tolls whatever for foot, horse, or vehicle transit over the bridge mentioned in the suit”.
Opinion.
The plaintiffs in this suit are residents of the city of Shreveport, and the parish of Bossier, who, having large property interests therein, have been compelled for years past, and will be obliged in the future, to pay large amounts of money for the crossing of their carts, wagons, and vehicles, and employees over Red river, at and opposite the city of Shreveport.
At one time the crossing at this point was by means of boats, but since 1884 it has been over a bridge,' built across that stream, by the Vicksburg, Shreveport and Pacific Railroad Company.
That corporation was incorporated by an Act of the General Assembly of Louisiana, approved March 11-th, 1852, and it was given authority in the 12th section of the Act, to do everything necessary for the construction, repair, and maintaining of -the railroad * * * to determine the location of said road between a point opposite Vicksburg, on the Mississippi river, by way of Monroe, on the Ouachita river, and Shreveport on Red river, thence west to Texas, and to make and construct all works whatsoever, which they might deem necessary.
Under the right so conferred upon it, the company constructed the bridge across Red river, which has just been referred to, and it was thrown open for traffic in 1884.
Congress by Act of March the second, ratified the building of the bridge.
*1217 Prior to the construction of the bridge, the authorities of the city of Shreveport, and of the parish of Bossier, conceived the idea of substituting for the ferry crossing, then existing at Shreveport, a bridge crossing, by utilizing the railroad bridge, about to be built.
At that time the police juries of the different parishes had been given, by the ninth clause of Section 2743 of the Revised Statutes, the exclusive privilege of establishing ferries and toll bridges, within their respective limits, and of fixing the rates of ferriage and toll to be charged, and by the seventh section of Act No. 25 of 1878, incorporating the city of Shreveport, it was given the power to establish, and regulate, all market places, and to farm out the same, and jointly with the parish of Bossier, to let out the ferry or ferries across Red river, within the limits of said city, the revenues from the same to be equally divided between the city and the parish of Bossier.
In pursuance of the plan of making use of the railroad bridge, negotiations took place, between the local authorities and the railroad company, which culminated in the contract between the city of Shreveport, the parish of Bossier, and the Vicksburg, Shreveport and Pacific Railroad Company, recited in plaintiffs’ petition, by which the bridge was so constructed, as to be made available not only for railroad, but also for ferry purposes.
This fact carried with it an increased cost for the original building of the bridge, and involved future outlays for its maintenance and repairs.
The authorities bound themselves by certain obligations, specified in the contract, in consideration of which, the railroad company conveyed to the other contracting parties, a right of way for horses, ver hides, and passengers over its bridge.
Among the obligations assumed by the city of Shreveport, and the parish of Bossier, was the payment by them to the railroad company of certain amounts of money, to reimburse with interest the railroad company for the increased cost of construction of bridge, which they were to raise by means of toll for crossing.
In the event the city and parish should default in this payment, the railroad company was authorized to take charge of the collection of the tolls, and apply them to the payment of their claim and interest.
The fifth clause of the contract between the parties declared “that the tolls should (shall) be collected and be received by the party of the first part (the city of Shreveport and parish of Bossier), and it shall *1218 be obligatory upon said first party, that the revenues arising from the collections of said tolls, shall after all deductions properly chargeable thereto for expenditures, by the said party under this agreement, shall have been made, be applied to a reduction of the ferry tolls for the ensuing year, and that said reduction shall be at the rate of ten per centum, from the existing rates, and at a rate not exceeding ten per centum for each succeeding year, upon the rates charged during each preceding year, and it is further agreed that the surplus revenues accruing- under this agreement shall not be applied to any other purpose than the reduction of the ferry tolls, and the extinguishment of the debt for the construction- of said bridge.”
By the second clause of the contract, the railroad company undertook to be .responsible for the maintenance of the bridge and the approaches -thereto, in first class order and condition, at all times, and that the expenses incurred by such maintenance and inspection, should be charged between the city and parish, and the company respectively, in proportion to the nature of the work.
A supplemental contract was made in June, 1892, between the parties in which, after reciting the first contract, and that disagreements had arisen between the parties, as to the duties and obligations of each to the other, especially as to the construction of sections 2 and 13 of the contract, and reciting'that a disastrous rise of Bed river had destroyed the eastern abutment span of the bridge, necessitating the building of a temporary span for the same,' for present use, and in the' early .future, a permanent span of similar character to the original structure, which would necessarily be much longer than the original, by reason of the caving bank -of the river, and reciting that it was apparent that extensive works would be necessary to prevent the recurrence of the danger to the structure, it was declared that for the purpose of fixing the relative duties and obligation of the parties to each other, and especially the eonslfcruction which would be thereafter given to sections 2- and 13 of the original contract, and to provide for the discharge of the obligations of the parties to each other as to the construction, maintenance, reconstruction and repair of the bridge and all works necessary for the protection and preservation of the structure by the railroad company, as well as the duty of the city and parish to reimburse the railroad company their portion of the expense incurred and to be incurred in the performance of its obligations, that it should be the duty of the party of the first part (the city and parish) *1219 to pay with interest one-seventh of the cost of repair, maintenance, construction and reconstruction of the general work, common to the general use of the same; that the railroad company should pay alone for those portions of the work, whether in construction, repair or maintenance of same, which may be for the exclusive use' of the railroad, and the city and parish should pay to the railroad company all expenses incurred by it, in the construction, repair; reconstruction, maintenance and preservation of those portions of the bridge and its approaches and fixtures which are for the exclusive use of the bridge as a wagon bridge and designed and intended to promote its use as such.
After the construction of the bridge, a schedule of tolls was fixed, which was replaced later, by a reduced tariff, which was still in force, when the present suit was instituted.
The original cost of construction has long since been paid and the tolls collected (less expense of maintenance) have been for a number of years past, a source of revenue and applied by the city and parish for general parish and city purposes.
It was under this condition of things that this action was brought, upon the grounds set forth in the petition.
After the case was at issue the General Assembly by Act No. 158 of 1898, provided a new charter for the city of Shreveport.
The seventh section of that charter reads as follows:
“To establish and regulate all market places and to farm out same; and jointly with the parish of Bossier let out the ferry or ferries across Red river within the limits of said city; the revenues from the same to be equally divided between the city and parish of Bossier.”
This clause of the old charter of 1878 is retained literally to the end that the rights of litigants or their associates in suit of Vance, Oliff, et als. vs. City of Shreveport, now pending on the District Court, Caddo parish, may not be effected, but tried under the law as it existed at the institution of said suit, and without reference to this Act, and until its final determination oh the merits and until the election hereinafter provided for is held and its results ascertained definitely deciding the issues, pending said suit, tolls on the bridge over Red river to continue; provided that within sixty days after the final determination of said suit the right of the city of Shreveport to fix and regulate tolls on the present bridge over Red river in conjunction with Bossier parish shall be submitted to an election by the qualified elec *1220 tors' within the new territorial limits of said city, which election it is hereby made mandatory on the Mayor to call.
“And at the same eleeton shall be submitted the question as to whether the said bridge shall be free for the use of the public or a pay bridge, and if a pay bridge, whether the schedule of tolls shall be for revenue or whether they shall be simply for maintenance of said bridge or the city’s interest therein; and the said election shall not be decisive until one of these propositions has received a majority vote, and if the proposition for simple maintenance fund shall be decided upon then the said city is to collect no more than is needed to carry out that decision and shall not divert nor use said fund for any other purpose under penalty of the forfeiture of the grant. If the proposition to make said bridge a pay bridge for revenue prevails the council will nevertheless have the authority to make it free at any time, temporarily or otherwise. If the free bridge proposition prevails, then no toll at all is to be charged.
“The commissioners at said election shall be appointed by the District Court of Caddo parish from advocates of the three different propositions as near as possible, and polling place in each ward of the city. The intention being to legalize whatever is decided upon by the qualified electors of the said city of Shreveport at said election or elections, and if a majority of said electors favor a pay bridge, either for maintenance or revenue, the power Ifco exercise such grant is hereby conferred. Three sets of ballots shall be provided so as to embrace the three propositions heroin embraced.”
The first question which we meet in the investigation of this case, is the exception taken by the parish of Bossier, to the jurisdiction over it of the District Court for the parish of Caddo.
The court is referred to State ex rel. Nelson vs. Fournet, 30 Ann., 1104, as establishing the incorrectness of the ruling of the District, Court of that parish.in exercising jurisdiction.
If the parish of Bossier had had no connection with the parish of Caddo, and had been proceeded against alone, we think the action against it should have been brought in Bossier, but occupying as it did, the position of one of the parties to a joint contract, in which all parties thereto are concerned in, a suit involving rights springing from the contract, we think the parish of Bossier was properly made a party to the litigation, at the instance of the city of Shreveport, and ex necessitate called into the parish of Caddo. ITennen’s Digest, pago *1221 351, No. 2; 8 La., 524; 3 Rob., 26; 3 Ann., 43; 5 Ann., 674-740; Francis vs. Laonie, 21 Ann., 265; Lobdell vs. Bushnell, 24 Ann., 297.)
The plaintiffs contend that the city of Shreveport and the parish of Bossier, under a power to establish and lease ferries, and receive revenues therefrom, were without power or capacity to build a bridge, or establish a toll charge upon a bridge; that action to that effect was net •only ultra vires and not binding upon any one, but on the contrary an illegal obstruction upon what they claim to be a public highway, in the nature of a nuisance, which those who have constant occasion to cross Red river, with their teams and employees, have the legal right to have abated by injunction.
The bridge over the Red river at Shreveport was not built by the city of Shreveport, or the parish of Bossier, or by both, but by the Vicksburg, Shreveport and Pacific Railroad Company.
There can be no serious question raised as to its being a construction over the Red river, placed there by legal authority.
The question of the authority of the city of Shreveport, and the parish of Bossier, to build a bridge, over the river, is entirely outside of the ease.
When the railroad company built the bridge, it became corporation property, to be used by it for railroad purposes.
It is a mistake to say that the bridge became a highway, in the sense of being thrown open to the use of the general public, without the consent of the railroad company.
From one standpoint, that is to say, from the use to be made of it, by the corporation owning it, for a public purpose, it might be considered public property, but in respect to rights of ownership, and power of controlling the possession of the same, free from the intrusion of parties going upon the same, without permission of the owner, it is private property.
The contract which the owner of this particular bridge made with the City of Shreveport, and Parish of Bossier, by which the latter bound themselves to contribute to a portion of the price, did not throw the latter into the relation of joint owners with the Railroad Company, nor did that contract carry with it, as a result, the dedication of the bridge to public use, in any proper sense of that word.
The relations of the city and parish with the Railroad Company were, at their origin, contractual relations, such they are now, and *1222 such they must remain until the contract be set aside in some legal way. , a
If any private individual should cross the bridge during the pendency of the contract, it would be by virtue of and undei the contract rights which the city and parish had acquired and subordinated to the right which the latter had acquired themselves, to control the circumstances under which parties should pass upon the bridge; he would not have acquired an absolute legal right inherent in himself as a citizen to cross the.bridge ipso facto by the making by the city and parish of a contract with the Railroad Company.
If the city and the parish were to fail to carry out the continuing obligations to which they have bound themselves by their contract', the Railroad Company would be unquestionably entitled to have the contract declared ended by judicial decree, and with the ending of the contract would terminate all rights, mediate or immediate, which would have been based upon it.
Individuals would, in vain, set up any rights predicated upon mere citizenship or membership in the “general public,” and so to-day the contracting parties could, by common consent, terminate the contr'act, individual opposition to the( same to the contrary notwithstanding, unless the State, by some action of its own, had interposed its aulihority over the city and parish preventing such action.
The city and the parish could terminate the self-assumed obligations taken upon themselves by their contract, and fall back upon their right of ferry privilege, with the right of toll or ferriage thereto attached, if they thought proper.
Under such circumstances, the rates of toll would be beyond individual control, by suits at -law, and would doubtless he greater than present bridge rates.
It is obvious that it is neither the interest, nor the desire of the plaintiffs, that this should be done.
Plaintiffs, in their brief, say they do not question or complain of the building of the bridge; that they can concede to each of the defendants the authority to construct the bridge, and open it to the public. They contend that having constructed it and made it a public highway, the defendants have no right or authority for obstructing the highway by the exaction of toll.
While declaring the contract of the city and parish totally unauthorized and ultra vires, they seek to avail themselves of benefits *1223 and results which are exclusively based upon and dependent upon the continuance of the contract, which is sought to be repudiated as being without warrant of law.
If true it be, that the contract was of that character, the logical result would be that it should be made to terminate, and not that the “general public” should have acquired rights under and through it.
While it might well be that neither the City of Shreveport, nor the Parish of Bossier, would be entitled, under a grant of power, to establish ferries and charge tolls for ferriage, to build a bridge over Red river, it by no means follows that a bridge having been built by some person other than themselves having authority to build it, they would not be authorized by contract with the bridge owner, to substitute a bridge crossing for a boat crossing.
There is no parellelism, we think, between the two acts.
Public considerations enter into one act which do not in the other.
Plaintiffs assert that the Railroad Company was without authority itself to charge tolls from parties crossing their bridge, and we understand them to contend that, therefore, the city and parish could not derive any right or power, under a contract with the company, to charge toll.
The right of toll is not based by the city or parish upon having been acquired by transfer or assignment of any right to that effect held by the Railroad Corporation.
Their right is set up as an original authority from the State, not derivative from the Vicksburg, Shreveport and Pacific Railroad Company.
It is claimed by them, “that having the undoubted right to establish a ferry and collect tolls therefrom, they could, if they saw fit, in the general interest to furnish better and cheaper means of crossing the river, substitute a bridge crossing upon an existing bridge, for a ferry crossing. Their action was proper and reasonable; the public was benefited; plaintiffs did not want the re-esitablishment of the ferry; that would be an injury to them.”
Plaintiffs say in their brief:
“It is settled that bridges are of the same nature as ferries, and mere substitute for ferries. (2nd Am. & Eng. Ency. of Law, p. 540; 2 Dillon, Sec. —; Note 1, p. 881.)
*1224 “A ferry is nothing more than the continuation of a road, and as far as regards the authority of the State, does not differ from a toll bridge. 7 Am. & Eng. Eney. of Law, 941.
“Gilman vs. Philadelphia, 18 Supreme Court Reports, p. 100.
“So far as regards the authority of the State ‘a bridge and a ferry are equivalent terms. Express power to establish a ferry necessarily implies power to establish a -toll bridge.’
“Counsel contend that without legislative grant, municipal corporations are without authority to exact tolls for crossing a bridge.
That is tr.ue. It is also true that the power to exact tolls for crossing a ferry must be granted by the State.
But the power to establish a toll ferry has been granted to the city and parish, and the grant, by necessary implication, includes power to establish as a substitute for a toll ferry, a toll bridge.”
We think this contention is well founded, at least as against collateral attack by private individuals.
The city and the parish, by their contract with the Railroad, acquired such a qualified interest in the use and possession of the bridge, as to entitle them by virtue of that interest, so long as the State does not object, to require any one availing themselves _pf this right of possession and .use to cross ithe river, to pay for the same, leaving the parties to cross or not as they might think proper. (Harvey vs. Potter, 19th Ann., 264; Grant vs. Leach, 20th Ann., 333.)
Plaintiffs would have no more right to cross, without pay, upon a bridge which the city or parish had leased, than they would upon a boat which they may have leased.
We think the city and parish had authority to substitute, as they did, and under the circumstances that they did so, a bridge crossing for a ferry crossing, and to charge tolls for the crossing.
We have reached that conclusion independently of the provisions of Act No. 158 of 1898, which we will hereafter refer to.
The other question submitted to us is the demand made by plaintiffs- to have the tolls reduced to an amount not greater than an amount sufficient and necessary to maintain the bridge, based, first, upon the clause in the contract between the parties, that the tolls would be gradually and annually reduced, and next upon the ground that when the existing debts, created by-the-contract between the city and parish and the Railroad Company, were paid, it would be unreasonable and unnecessary to require any heavier toll than would *1225 suffice for the purpose just stated, and further, that the city and parish are not authorized to exact tolls for the purposes of general revenue.
It is urged that the reduction in the toll rate provided for in the contract between the city and parish and the Railroad Company was self-operative each year, and, the toll having been finally extinguished by reduction, it could not be re-established, nor could the reduction have been stayed by adverse action, as the elause in question evidenced a stipulation pour autrui in favor of the general public, which, once granted, could not be revoked or recalled.
Why the clause in the contract was inserted therein, in the terms which were employed, we do not know; we are inclined to think it was intended to evidence a reserved right, not a self-imposed obligation, for -the Railroad Company was acting exclusively in its own interest, and in no wise was authorized to act, nor did act, for the “general public.”
Unless construed as a reserved right, the elause is utterly foreign to the contract between the parties, and would, at best, amount only to a declaration of an intended line of future action, not binding as an obligation, but subject to change at any time. (C. C., 1814; 48 Ann., 1549, Board of Trustees vs. Campbell).
The city and parish in dealing with the subject matter were acting under their power of general administration, and were free to alter their course whenever, in their view of existing conditions, it was expedient for them to do so, and of this they were the judges.
Individual citizens have no vested rights in this matter, nor control over it. (Paving Company vs. Railroad Company, 49 Ann., 1611).
We Ithink it is accepted. generally as true that where the General Assembly has confided to subordinate political bodies by express delegation general powers over some express subject matter, that the action of those bodies, in dealing with these subjects, is not subject to review by the judiciary as being unreasonable, at the instance of individual citizens, and the judgment of courts substituted for that of the bodies entrusted with the duty. Municipality vs. Pease, 2nd Ann., 538; Parkersburg Transportation Co. vs. Parkersburg, 107 U. S., 691.
'We are of the opinion that if the city and parish improperly exercised their power of discretionary action over the rates of toll, or in *1226 charging tolls, the remedy for the same was with the General Assembly and not with the Districlt Court, nor with us.
We have disposed of the matter before us without consideration of Act No. 158 of 1898.
It may be Well for us to refer to that act.
We think that act recognizes, as legal and binding, the contract between the city and parish, and the Railroad Company, for whatever may he the result of the election ordered by the Legislature, to be held, the use of the bridge, for the purpose of crossing Red river, is to be continued in the future, and could only be continued under that contract.
The Legislature has simply transferred for decision by the people of Shreveport, at an election to he held in that place, instead of dealing with the question itself, whether or not the bridge over Red river should be a free or a pay bridge.
Even if this court had taken a different view of the question submitted to it, from that which it has just announced, we do not see how we could, well, by a judgment, dealing exclusively with future action, attempt to fix matters which have been expressly referred for decision by the legislative body having authority over the subject matter, to a popular vote.
Obviously the plaintiffs have no vested rights which would admit of their opposing the results of that election.
For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be and the same is hereby annulled, avoided and reversed, and plaintiffs’ demand is hereby rejected, and their suit dismissed.
Rehearing refused.
Blanchard, J., takes no part in the decision of this case.