(106 So. 377)

No: 27304.

## TALBOT v. LOUISIANA HIGHWAY COMMISSION et al.

(Nov. 2, 1925. Rehearing Denied Nov. 30, 1925.)

*(Syllabus by Editorial Staff.)*

1. **Bridges** ⟨5⟩—**Statute authorizing contracts for toll bridges not violative of Constitution giving public service commission control of public utilities.**

Act No. 141 of 1924, authorizing highway commission to let contracts for the construction and operation of toll bridges, *held* not violative of Const. art. 6, §§ 4–7, giving public service commission exclusive right to regulate and govern public utilities and fix rates, fares, tolls, etc., especially in view of powers and functions of highway commission under Const. art. 6, § 19, and Act No. 95 of 1921 (Extra Sess.).

2. **Monopolies** ⟨10⟩—**Law authorizing exclusive franchise to construct and operate toll bridges not unconstitutional as creating monopolies.**

Act No. 141 of 1924, authorizing the highway commission to grant exclusive franchises for the construction and operation of toll bridges, is not violative of Const. art. 13, § 5, requiring Legislature to prohibit monopolies, and article 19, § 14, prohibiting monopolies.

3. **Bridges** ⟨5⟩—**Franchise for toll bridge held not perpetual franchise prohibited by Constitution.**

Franchise granted under Act No. 141 of 1924, authorizing the highway commission to grant franchises for construction and operation of toll bridges, is not violative of Const. art. 13, § 7, forbidding grant of perpetual franchise or privilege, in view of provisions in contract for purchase of bridge by state at any time after 20 years.

4. **Bridges** ⟨5⟩—**Letting franchise for construction of toll bridge without advertisement or calling for bids not unconstitutional.**

The letting by the highway commission under Act No. 141 of 1924 of a franchise for construction and operation of a toll bridge without advertisement or calling for bids is not unconstitutional.

5. **Statutes** ⟨79(1)⟩—**Act authorizing highway commission to grant exclusive franchise for toll bridge not unconstitutional as a special law.**

Act No. 141 of 1924, authorizing highway commission to grant exclusive franchise for construction and operation of toll bridge, is a general law and not violative of Const. art. 4, § 4, prohibiting local or special laws granting special or exclusive rights, privileges, or immunities.

6. **Bridges** ⟨5⟩—**Act authorizing highway commission to grant franchise for toll bridge not violative of Constitution providing for building of bridges from general highway fund.**

Act No. 141 of 1924, authorizing highway commission to grant exclusive franchises for toll bridges, is not violative of Const. art. 6, § 19, providing for building bridges over navigable streams wholly from general highway fund, which provision was merely intended to exempt municipalities, parishes, or road districts, in view of Act No. 95 of 1921 (Extra Sess.).

7. **Bridges** ⟨15⟩—**Franchise for construction of toll bridge held not to make impossible construction by highway commission of roads and bridges authorized by constitutional amendment.**

A franchise granted by highway commission under Act No. 141 of 1924 for the construction and operation of a toll bridge across Lake Pontchartrain *held* not illegal as making it impossible for highway commission to build the Chef Menteur road and bridges, authorized by constitutional amendment, Act No. 18 of 1918 (Extra Sess.).

8. **Bridges** ⟨15⟩—**Contract for toll bridge franchise held to sufficiently restrict tolls to use of bridge itself.**

A contract by highway commission under Act No. 141 of 1924 for construction and operation of a toll bridge across Lake Pontchartrain *held* to sufficiently show that no additional tolls for use of connecting roads might be allowed, in view of annexed schedule of tolls.

**9. Bridges ☞33—Schedule of maximum bridge tolls held not grossly excessive.**

Contract let by highway commission under Act No. 141 of 1924, for construction and operation of toll bridge, *held* not illegal as providing for grossly excessive tolls; the schedule attached merely providing for maximum tolls, and there being no assumption that tolls would be higher than the public would be willing to pay.

**10. Bridges ☞15—Contract for construction of toll bridge held not illegal in not specifying type of bridge to be built.**

A contract let by highway commission under Act No. 141 of 1924, for construction and operation of a toll bridge, which provided that plans and specifications be submitted and become part of contract, *held* not illegal as failing to specify type of bridge, in view of section 3 of statute not requiring approval of plans except so far as to protect public safety.

**11. States ☞119—Toll bridge franchise is not violative of Constitution prohibiting funds, credit, and property of state from being loaned or granted.**

A franchise for the construction and operation of a toll bridge is not such a property right belonging to state and its citizens that its grant is forbidden by Const. art. 4, § 12.

Land and Brunot, JJ., dissenting.

Appeal from Nineteenth Judicial District Court, Parish of East Baton Rouge; W. Carruth Jones, Judge.

Suit by William Harry Talbot against the Louisiana Highway Commission and others. Judgment for defendants, and plaintiff appeals. Affirmed.

George Janvier, of New Orleans, and H. Payne Breazeale, of Baton Rouge, for appellant.

Percy Saint, Atty. Gen., and W. M. Barrow, Special Counsel, of Baton Rouge, for appellee Louisiana Highway Commission.

Sanders, Baldwin, Viosca & Haspel, of New Orleans (Rene A. Viosca, of Hammond, Curator Ad Hoc), for appellees Eli T. Watson, Oliver J. Anderson, Meredith C. Jones, and H. A. Morrison.

P. M. Milner, of New Orleans, for intervener.

O'NIELL, C. J. This is a suit to annul the contract by which the Louisiana highway commission granted a franchise to Eli T. Watson, Oliver J. Anderson, Meredith C. Jones, and H. A. Morrison, to construct and operate a toll bridge across Lake Pontchartrain. The contract is dated the 26th of February, 1925. It purports to be authorized by an act of the Legislature, Act 141 of 1924, p. 263. The plaintiff here challenges the constitutionality of the statute, for several causes, and contends that the contract is null for those and other causes specified in his petition. The district court dismissed the suit on an exception of no cause of action. The plaintiff has appealed from the judgment.

The Act 141 of 1924 is a general law, not a special or local law. It does not mention Lake Pontchartrain, or refer particularly to any body of water.

The first section of the act declares, in general terms, that, from time to time, as the Louisiana highway commission shall consider desirable or advisable, for developing and perfecting the state highway system, the commission is directed and empowered to let contracts, binding upon the commission and the state, to persons, firms, corporations, or associations of persons, for the construction, ownership, maintenance, and operation of bridges, viaducts, fills, trestle structures and approaches thereto.

The second section of the act declares that in each instance the highway commission shall decide whether the schedule of tolls submitted by any party applying for a franchise is fair to the public; and that the schedule, when accepted by the commission, shall be incorporated in the contract.

The third section of the act declares that every bridge, viaduct, fill or trestle, and approaches, to be constructed under contract with the highway commission, shall be constructed according to the standard of safety adopted by the commission, but that the com-

mission shall not be required to approve the plans and specifications submitted by the party bidding for the contract, except in so far as such approval shall be necessary for the public safety.

The fourth section of the act declares that, so long as any such bridge, viaduct, trestle work, etc., shall remain the property of the contractor or his assigns, the state, or the highway commission, or any subdivision of the state, shall not permit the construction or operation of any other bridge, viaduct, fill, or trestle structure, etc., that shall conflict in any way with the terms of the contract; and that the state, or any subdivision of the state, shall not interfere in the maintenance or operation of such bridge, or viaduct, etc., that has been constructed, except so far as such interference may be necessary for the public safety or for compelling compliance with the contract.

The fifth section of the act declares that the highway commission shall have the right, at any time after 20 years from and after the completion of any such bridge, viaduct, fill, or trestle, etc., to buy it on the terms and conditions stipulated in the contract.

The sixth section, being the last section of the act, merely declares that all laws or parts of laws in conflict with or contrary to the provisions of the act are thereby repealed.

[1] The first contention of the appellant in this case is that the statute, in so far as it undertakes to give the highway commission authority to fix rates, or to establish a schedule of tolls, for a toll bridge, is violative of section 4 of article 6 of the Constitution, giving to the Louisiana public service commission the exclusive right to supervise, regulate, govern and control the public utilities, and to fix the rates, fares, tolls and charges for commodities furnished or services rendered by the public utilities.

The answer to the argument is that the proposed toll bridge cannot be under the supervision, regulation or control of the public service commission, or be a public utility, before it is built. It is not necessary to decide now whether the bridge will be under the supervision of the public service commission when the bridge is built and opened to traffic; or whether it will require an act of the Legislature to declare it a public utility; or whether the Legislature will have the right to declare it a public utility and thereby put it under the supervision, regulation and control of the public service commission—when the bridge will have been built and opened to traffic. If we assume that the public service commission will have, authority to fix the rates or schedule of tolls for the bridge when it is completed and ready for traffic, there is no cause for the plaintiff or any other taxpayer to complain that the public service commission does not fix the rates, or approve the schedule of tolls, before the bridge is built. On the other hand, if we assume that the bridge will not be under the supervision, regulation or control of the public service commission, when the bridge will be built and in service, it is certain that the letting of the contract, the fixing of the rates or schedule of tolls, cannot be now under the supervision, regulation or control of the public service commission.

The functions of the public service commission are fixed—and the extent of the commission's authority is defined—in article 6 of the Constitution, in sections 4 to 7, inclusive. There is nothing in those provisions that can be construed as forbidding the Legislature to delegate to the highway commission the authority to make contracts granting franchises for toll bridges over navigable bodies of water, in connection with the public highways. On the contrary, section 19 of the same article of the Constitution declared that the Legislature should provide for the establishment and maintenance of a system of highways and bridges, under the supervision of the board of state engineers,

until otherwise provided by law, and should provide for the regulation of traffic on the public highways. Accordingly, the Legislature did, by the Act 95 of 1921, p. 181, create the Louisiana highway commission and give it supervision and control over the establishment and maintenance of the highways and bridges, and the regulation of traffic on the highways.

The provisions of the Constitution defining the functions and authority of the public service commission, sections 4 to 7, inclusive, of article 6, do not, in terms, give the commission authority to supervise, regulate or control any and every concern serving a public want and called a public utility. It is true that section 4, after declaring that the commission shall have authority to supervise, govern, regulate and control all common carrier railroads, street railroads, interurban railroads, steamboats and other water craft, sleeping car, express, telephone, gas, electric light, heat and power, waterworks, common carrier pipe lines and canals (except irrigation canals), says: "and other public utilities in the state of Louisiana." But the language quoted means such other public utilities as the Legislature may place under the control of the public service commission, and such local public utilities as the electors of any city, town or parish may, by a majority vote, surrender to the control of the public service commission. That interpretation is expressed in the second paragraph of section 4, and in sections 5, 6 and 7 of the same article. In the second paragraph of section 4 it is said that the authority of the commission shall include all matters connected with the service to be given or rendered "by the common carriers and public utilities hereby, or which may hereafter be, made subject to supervision, regulation and control by the commission." And in the same paragraph it is said that the right of the Legislature to place other public utilities under the control of the public service commission is unlimited.

In the fifth section it is said that the orders of the commission, fixing or establishing any rate, fare, toll or charge, for any commodity furnished or service rendered or to be rendered "by any common carrier or public utility named herein, or hereafter placed under the control of said commission," shall remain in effect, etc. In the sixth section it is said:

"If any common carrier or public utility now, or which may hereafter be placed, under the control of the commission, shall violate any of the rates, tolls, fares, or charges, or orders or decisions of the commission," etc.

The idea was that there might be other public utilities—other than those specified in section 4—that would not come under the control of the public service commission, without an act of the Legislature making it so. It was so said in Standard Oil Co. v. Louisiana Public Service Commission, 154 La. 557, 97 So. 859.

By section 7 of article 6 of the Constitution, the supervision, regulation and control over local public utilities was left with the cities, towns and parishes that already had such authority, unless and until the authority should be surrendered to the public service commission by a majority vote of the electors of the city, town or parish, at an election held under the provisions of an act to be adopted by the Legislature. Accordingly, the Legislature passed Act 116 of 1921. It is argued on behalf of the appellant that, in the case of the State v. City of New Orleans, 151 La. 24, 91 So. 533, we held that the only public utilities that were not placed under the supervision, regulation and control of the public service commission, by the provisions of sections 4 to 7, inclusive, of article 6 of the Constitution, were the local public utilities that were then left under the supervision, regulation and control of the municipal or parochial governments. The argument is not sustained by the decision cited, or by the opinion rendered in the case. The only question in the case was whether the

authority to fix the rate of car fare on the street railways in New Orleans was vested in the city council or in the Louisiana Public Service Commission. It was contended on behalf of the state that, in the first paragraph of section 4 of article 6 of the Constitution, the public service commission was given authority to supervise, regulate and control street railways, and other public utilities of a local character. . It was argued on behalf of the city of New Orleans, and was decided, that the reservation made at the end of the paragraph, "except as herein otherwise provided," taken in connection with the reservation made in section 7, saved for the city the power of supervision, regulation and control of her local public utilities. We did not decide—for there was no occasion for deciding—whether the reservation made at the end of the first paragraph of section 4, "except as herein otherwise provided," might refer also to other public utilities, besides the local utilities reserved in section 7. On that subject, see, also, Baton Rouge Waterworks Co. v. Louisiana Public Service Commission, 156 La. 539, 100 So. 710.

It is argued on behalf of appellant that, as a bridge serves the purpose of a ferry, and as a ferry is a water craft, therefore the specifying of "steamboats and other water craft," in section 4 of article 6 of the Constitution, brings the proposed bridge under the supervision, regulation and control of the public service commission. In support of the argument, the learned counsel cite the case of Oliff v. City of Shreveport, 52 La. Ann. 1203, 27 So. 688, where it was held that a legislative grant of authority to the city of Shreveport, to establish a toll ferry, included, by necessary implication, the right to establish a toll bridge, as a substitute for the ferry. The comparison is not analogous to the proposition advanced here. Besides, as we have said, the argument in this case is, not that the proposed toll bridge will come under the supervision, regulation and control

of the public service commission when the bridge is completed, but that the right to grant a franchise to construct the bridge is already under the jurisdiction of the public service commission. We agree with the district judge that it is not so.

[2] Appellant's second contention is that the Act 141 of 1924 violates section 5 of article 13 of the Constitution, directing the Legislature to enact general laws to prohibit monopolies, and violates section 14 of article 19, prohibiting monopolies, or combinations to monopolize trade or commerce.

In directing the Legislature to enact laws to prohibit monopolies, and in prohibiting combinations in restraint of trade or commerce, the Constitution does not refer to exclusive franchises, as being monopolies. It is too well settled to be disputed now that the Legislature may grant, or confer the right upon a commission, or an administrative board, or a municipality or parish, to grant, exclusive franchises, for toll bridges or ferries, or for any other public service that is, in its nature, a monoply. As a rule, such a franchise has no value, if it be not exclusive.

"In regulating those public services which have to do with transportation, it is undoubtedly permissible to grant exclusive franchises, notwithstanding legal monopolies are thereby created. This applies to common carriers by land and water, as railways and ferries, to turnpikes and toll bridges, and to wharves and landings.

"It is equally true of other public utilities that exclusive franchises do not create illegal monopolies, Thus, no illegal monopolies are created by exclusive franchises for gas and electric lighting, for water and irrigation, and telephone and telegraph. There are some cases apparently to the contrary, most of which go upon special grounds which show in the particular case lack of authority to make the grant in question, although the language in them often shows fear of monopoly." 27 Cyc. 896, 897.

As to the right of the Legislature to grant, or to authorize municipalities and parishes to grant, exclusive franchises, such as for

railroads, toll bridges or ferries, see Pontchartrain Railroad Co. v. Orleans Navigation Co., 15 La. 404; Crescent City Gaslight Co. v. New Orleans Gaslight Co., 27 La. Ann. 138; St. Joseph Plank Road Co. v. Kline, 106 La. 325, 30 So. 854; State v. New Orleans Warehouse Co., 109 La. 64, 33 So. 81; Blanchard v. Abraham, 115 La. 989, 40 So. 379; Police Jury v. Robichaux, 116 La. 286, 40 So. 705; McNeely v. Town of Vidalia, 157 La. 338, 102 So. 422. See, also, Enfield Toll Bridge Co. v. Hartford & New Haven Railroad Co., 17 Conn. 40, 42 Am. Dec. 716; City of Laredo v. International Bridge & Tramway Co., 66 F. 246, 14 C. C. A. 1; State v. Des Moines City Ry. Co., 159 Iowa, 259, 140 N. W. 448; Calumet Service Co. v. City of Chilton, 148 Wis. 334, 135 N. W. 131; New Orleans Gas Light Co. v. Louisiana Light & Heat Producing & Manufacturing Co., 115 U. S. 650, 6 S. Ct. 252, 29 L. Ed. 516.

[3] Plaintiff's third contention is that the Act 141 of 1924 undertakes to authorize the granting of a perpetual franchise, or one that cannot be terminated by the state except upon terms so onerous as to make the franchise virtually perpetual, all in violation of section 7 of article 13 of the Constitution, forbidding the state, or any subdivision of the state, to grant a perpetual franchise or privilege.

The franchise granted in this case is not perpetual. It is provided in the sixteenth clause of the contract that, at any time after 20 years from and after the completion of the bridge, the state shall have the right to buy it, at a price equal to the cost of the bridge and approaches and all new construction, and other expenditures chargeable to capital or investment, less 1 per cent. per year for depreciation, and plus the cost of the connecting highways. There is also a provision for arbitration, in the event of any disagreement with regard to the original cost, etc. The price, therefore, at which the state may buy the bridge, at the end of 20

years, is 80 per cent. of its cost, and is one per cent. less after each succeeding year. In the meantime, the state will have collected from the proprietors of the bridge, under a stipulation in the second clause of the contract, $10,000, at the rate of a $1,000 a year, and under the third clause, 10 cents for every vehicle that crosses the bridge, payable monthly. As far as we know, the funds so collected may pay for the bridge. At any rate, we cannot say that the terms and conditions on which the state may terminate the franchise are so onerous as to make the franchise virtually perpetual.

[4] Plaintiff's fourth complaint is that the statute authorizes the letting of a franchise without advertisement or calling for bids, and thus permits secret and clandestine negotiations.

The Constitution does not forbid the granting of a franchise without previous advertisement or calling for bids. It is not unusual for a franchise to be granted without previous advertisement or calling for bids. By the Act 94 of 1921, the Legislature has authorized every city having a population of 100,000 or more (which means the city of New Orleans) "to grant indeterminate permits for the maintenance of street railway, ferry, electric light, gas and other public utilities in such city," without previous advertisement or calling for bids. And in Bisso v. City of New Orleans, 155 La. 5, 98 So. 737, where the constitutionality of the act was not questioned, it was held that the city might, at is option, either grant an indeterminate permit for operating ferries across the Mississippi river, without calling for bids or allowing competition, or grant a franchise to the highest bidder, after advertising for bids.

[5] Plaintiff's fifth contention is that, in authorizing the granting of exclusive rights and privileges, the Act 141 of 1924 violates section 4 of article 4 of the Constitution. The section cited forbids the Legislature to pass *any local or special law* granting to any

corporation, association or individual any special or exclusive right, privilege or immunity. The Act 141 of 1924 is a general law, not a local or special law. Before this statute was enacted, the law authorized municipalities and parishes to grant exclusive franchises for toll bridges and ferries; which was held to be not violative of Constitution. St. Joseph Plank Road Co. v. Kline, 106 La. 325, 30 So. 854; Blanchard v. Abraham, 115 La. 989, 40 So. 379; Police Jury of Lafourche Parish v. Robichaux, 116 La. 286, 40 So. 705.

[6] Plaintiff's sixth contention is that, in authorizing the granting of a franchise for a toll bridge, the Act 141 of 1924 violates the provision in section 19 of article 6 of the Constitution that the Legislature "shall provide for the building of bridges over navigable streams wholly from the general highway fund."

This provision, that all bridges that may be built over navigable streams shall be paid for "wholly from the general highway fund," means nothing more than that the cost of building a bridge over a navigable stream shall not be charged, either in whole or in part, to any municipality, parish or road district in which the bridge shall be located. A careful reading of the whole section leaves no doubt that its authors were not thinking of toll bridges. The idea was to divide, fairly, between the state and her subdivisions—municipalities and parishes and road districts—the cost of constructing and maintaining the system of state highways and bridges. The Legislature was allowed, by the terms of section 19, to "require parishes, cities, towns, villages and road districts to contribute a certain proportion of the cost of construction of state highways and bridges"; but there were two provisos, or restrictions, imposed upon the Legislature in that respect. The first proviso was that any parish that had already constructed any road that might be a part of the state highway system should be given credit in the state high-way fund for such mileage, when accepted by the state highway department, against any contribution that the parish might thereafter be called upon to make for further road building in the parish. The second proviso was that the cost of building bridges over navigable streams should come "wholly from the general highway funds," and not from any municipality, parish or road district, in which such bridge should be located. Here is the section, quoted in full, viz.:

"Sec. 19. The Legislature shall provide for the establishment and maintenance of a system of hard surface state highways and bridges, under the supervision of the board of state engineers, until otherwise provided by law, and shall provide for a general highway fund for the construction and maintenance thereof; shall authorize the acquisition, by expropriation or otherwise, of rights of way for highways, and drains therefor; may provide for the purchase or expropriation of property necessary or useful for the purpose of building and maintaining highways, and may require parishes, cities, towns, villages and road districts to contribute a certain proportion of the cost of construction of state highways and bridges; provided, that parishes which have completed such roads as may be part of the state highway system shall be given credit by the state highway fund for said mileage thus completed and accepted by the state highway department as against any sums which they might be called upon to contribute for further road building therein; shall provide for the immediate maintenance and resurfacing of the system of state highways and bridges, including portions of said system already constructed by the various parishes, from the general highway fund, and shall provide for the building of bridges over navigable streams wholly from the general highway fund, and shall provide for the regulation of traffic on public highways."

In the Act 95 of 1921, enacted at the special session called by the constitutional convention for the enactment of such legislation as was necessary to give effect to the provisions of the new Constitution, the Legislature interpreted section 19 of article 6 of the Constitution as we interpret it, and gave it the effect which it was plainly intended to have. The eighteenth section of the statute

declares that the total cost of all highway and bridge construction, under the provisions of the act, shall be paid out of the general highway fund; that the road district, parish, city, town or village in which any such work of improvement is being or to be done shall pay to the state such proportion of the total cost of the work as may be agreed upon between the highway commission and the governing authority of the district, parish, city, town or village; but that this shall not be construed to prohibit the commission from building or improving highways, without local aid, in any particular parish or other subdivision. The nineteenth section of the act declares that the cost of constructing and maintaining bridges over navigable streams shall be paid wholly from the general highway fund—meaning, of course, that the parish, road district or other subdivision in which the bridge is located, shall not be called upon to contribute to the cost of constructing or maintaining the bridge. The section of the statute closes with the declaration that, pending the bridging of any navigable river, the highway commission may, when the facts and circumstances and volume of travel warrant, establish, take over, control and operate, such ferries, barges or other means of water transfer, as it may deem advantageous to the public, and may prescribe and collect such ferriage charges as may be necessary to maintain such service.

It is significant that this provision in section 19 of article 6 of the Constitution and in section 19 of the Act 95 of 1921, that the cost of constructing and maintaining bridges over navigable streams shall be paid entirely from the general highway fund, mentions only bridges over navigable streams. There is no such requirement with regard to bridges over nonnavigable streams. It would be unreasonable to suppose that the authors of section 19 of article 6 of the Constitution intended to prohibit toll bridges over navigable streams while allowing them over nonnavigable streams.

[7] The next complaint is aimed, not at the constitutionality of the Act 141 of 1924, but at the legality of the franchise contract. It is said that the contract will make it impossible for the highway commission to build the Chef Menteur road and bridges (as authorized by the constitutional amendment adopted in November, 1918, according to the provisions of the Act 18 of Extra Session of that year), and indicates a desire on the part of the highway commission to discontinue and abandon work on the Chef Menteur road.

That allegation in plaintiff's petition is contradicted by a stipulation in the fifteenth clause of the contract complained of, which forms part of the pleadings. The stipulation is:

"That nothing herein shall be construed as conflicting with the provisions of Act No. 18 of the special session of the Legislature of 1918, adopted as an amendment to the Constitution of Louisiana in November, 1918, and as provided for along any of the routes designated in section 7 of Act No. 95 of the Special Session of the Legislature of 1921, or prohibiting said commission, its successor or successors, from building and maintaining any bridge forming part of said state highways."

The routes referred to, as being designated in section 7 of the statute of 1921, are, particularly, the Chef Menteur road, from New Orleans to a point opposite Logtown, Miss., and the road from New Orleans to Hammond; to complete which roads it will be necessary to bridge the lake. Counsel say that the constitutional amendment referred to—particularly as modified by the provisions of the new Constitution—does not compel the highway commission, but merely authorizes the commission, to build a bridge at Chef Menteur and complete the road to the point, near Logtown. We do not find it necessary to decide now what are the duties of the highway commission in that respect. It is sufficient to say that the contract complained of

cannot interfere with any such duty of the commission.

[8] The next complaint is that it is not stipulated plainly enough in the contract that the grantees of the franchise shall not be allowed to charge additional tolls for the use of the connecting roads, which the grantees are required to construct to connect the bridge with the state highways.

The language of the contract makes it as plain as can be that the only tolls that can be charged are for crossing the bridge. Tolls cannot be charged also for the use of the connecting roads, because no such charge is allowed in the schedule of tolls, made part of the contract.

[9] The next contention is that the tolls which the grantees of the franchises are allowed to charge are grossly excessive, based upon an assumed cost of the bridge, without any assurance as to what it will cost.

The Legislature has invested the highway commission, not this court, with the authority and discretion to say what tolls may be charged by the grantee of a franchise for a toll bridge, under the provisions of the Act 141 of 1924. This contract, of course, does not purport to fix the amount of the tolls to be charged, but provides only for the maximum tolls, viz., "The following shall be the maximum tolls to be charged for the use of said bridge and its approaches, to wit." Then follows the schedule. If the tolls are to be held down also by the public service commission, as the plaintiff contends, the public will be protected against excessive rates. Be that as it may, we do not assume that the tolls which the grantees of the franchise may charge will be higher than the public will deem just or be willing to pay. There is no violation of the statute, in that respect, on the part of the highway commission, and there is no showing of an abuse of the discretion which the statute has given to the commission.

[10] The next complaint is that the contract is vague and uncertain, in that it does not specify what type of bridge is to be built.

Section 3 of the statute authorizing the contract says that the highway commission shall not be required to approve the plans and specifications, in letting a contract for a toll bridge, except so far as such approval may be necessary for the public safety. However, this contract, in its twenty-third clause, does provide for plans and specifications to be submitted by the grantees, and provides that the plans and specifications, when signed by the parties to the contract, shall become a part of it. The contract is not illegal in that respect.

[11] Plaintiff's next and last contention is that this franchise is a property right belonging to the state and to all of the citizens of the state, and that the granting of such franchise is forbidden by the declaration in section 12 of article 4 of the Constitution that the funds, credit, property or things of value of the state or of any political corporation thereof shall not be loaned, pledged or granted to or for any person or persons, association or corporation, public or private.

The same provision was in article 58 of the Constitution of 1898 and of 1913, and in article 56 of the Constitution of 1879. In the case of St. Joseph Plank Road Co. v. Kline, 106 La. 325, 30 So. 854, it was contended that a police jury ordinance granting to a private corporation a franchise to construct and maintain a toll road extending three miles out from the parish seat was violative of article 58 of the Constitution of 1898; but the court held that the prohibition against the loaning, pledging or granting of the funds, credit, property or things of value of the state did not have any relation to the granting of such a franchise. A similar ruling was made in City of New Orleans v. New Orleans, Mobile & Chattanooga Railroad Co., 27 La. Ann. 414, under the Constitution of 1868.

Our conclusion is that the judgment appealed from is correct.

The judgment is affirmed.

BRUNOT, J., dissents.

LAND, J. (dissenting). Section 19 of Act 95 of 1921 (Extra Sess.), the State Highway Act, provides:

"That the cost of constructing and maintaining bridges or other passageways over navigable streams, shall be paid wholly from the general highway fund."

This provision in Act 95 of 1921 (Extra Sess.) was made in obedience to the mandatory requirement of section 19 of article 6 of the Constitution of 1921 that—

"The Legislature shall provide for the building of bridges over navigable streams wholly from the general highway fund."

Section 16 of said act declares:

"That every contract for highway improvement under the provisions of this act shall be made in the name of the state of Louisiana, signed by the state highway engineer, approved by the commission, and signed by the contracting party, and no such contract shall be entered into nor shall any such work be authorized which will create a liability on the part of the state in excess of the funds available for expenditure under the terms of this act."

In other words, the Legislature of 1921, in interpreting section 19 of article 6 of the present Constitution, has declared in plain and unmistakable language that no bridge shall be built by contract over a navigable stream, unless there are funds available for that purpose. This is but a repetition of the fundamental prohibition against the building of bridges over navigable streams in any other manner than from a designated public fund.

It is a prohibitory law, embodied in the Constitution of the state, and based not only upon economic considerations, but founded also in a salutary public policy, exerted by the state for the protection of the people of the state against excessive tolls, exacted under bridge contracts, monopolistic in fact, if not in law.

Section 19 of article 6 of the present Constitution provides for a general highway fund for the establishment and maintenance of state highways and bridges, without any distinction as to bridges, whether built over navigable or nonnavigable streams. Section 19 provides also, without any discrimination as to bridges, that the Legislature "may require parishes, cities, towns, villages and road districts to contribute a certain proportion of the cost of construction of state highways and bridges."

When this contribution is demanded by the state from any of its local subdivisions, the fund thus derived becomes a state fund, and must be paid into the state treasury, and allocated to the general highway fund, as much so as an auto license, or gasoline tax levied by the state and collected for highway purposes.

The state is not compelled by any provision of the present Constitution to pay back to, or to credit, any of its subdivisions with such local contributions as may be exacted for building state bridges.

The proviso in the Constitution is that—

"Parishes which have completed such roads as may be a part of the state highway system shall be given credit by the state highway fund for said mileage thus completed and accepted by the state highway department as against any sums which they might be called upon to contribute for further road building therein."

The state in this case has not taken over, as a part of its highway system, any bridge constructed over Lake Pontchartrain, either by the city of New Orleans or by the parish of St. Tammany.

The writer of this opinion fails, therefore, to appreciate the force of the argument, made in the opinion of the majority of the court, that the requirement that the Legislature "shall provide for the building of bridges over navigable streams *wholly* from the gen-

eral highway fund" means nothing more than "that the cost of building a bridge over a navigable stream *shall not be charged*, either in whole *or in part, to any municipality, parish* or road district in which the bridge shall be located." (Italics mine.)

This declaration is made in the very face of the express provision in section 19 of article 6 of the Constitution that the "Legislature * * * *may require parishes, cities,* towns, villages and road districts *to contribute a certain proportion of the cost of construction of state highways and bridges.*"

What can be more just and reasonable than that the locality receiving the immediate benefit of a bridge over a navigable stream shall pay to the state its fair proportion of the cost of construction?

It is too plain for serious argument that under the present Constitution the local subdivisions of the state may levy special taxes *voluntarily* for the building of *local* roads and bridges, and that, in addition to these special taxes, the state may require a *compulsory* contribution from local subdivisions for the building of roads and bridges forming a part of the state highway system. Article 10, § 10; article 14, § 14 (a); article 6, § 19, Constitution of 1921.

It jumps to the eye, from a mere reading of the provisions of section 19 of article 6 and of other provisions in the present Constitution, that it was the clear intention of the framers of that instrument that there should be established in this state for the benefit of the people a system of *free public* roads and bridges, maintained by public taxation, and not a system of toll bridges and turnpikes, maintained by syndicates, or private persons, to the detriment of the general welfare.

Act 141 of 1924, under which the present contract for the construction of the toll bridge over Lake Pontchartrain was made, is clearly unconstitutional, in my opinion, and

159 LA.—30

said contract is therefore illegal, null, and void, for the reason that said act contravenes the provision of section 19 of article 6 of the present Constitution, prohibiting the Legislature from building bridges over navigable streams, unless built "*wholly* from the general highway fund."

It is elementary that—

"Whatever is done in contravention of a prohibitory law is void, although its nullity be not formally directed." R. C. C. art. 12.

I therefore respectfully dissent from the opinion of the majority of the court.