LOTTINGER, Judge.
The petitioner, Greater Baton Rouge Port Commission, filed this suit against defendant, Cargill, Incorporated, asking for a declaratory judgment interpreting certain provisions of an Act of Lease between petitioner, and defendant. The Lower Court rendered a judgment in favor of the petitioner, and the defendant has appealed.
Plaintiff, the Greater Baton Rouge Port Commission (hereinafter called the “Commission”) is an executive department of the State of Louisiana, created pursuant to, and operating subject to, the provisions of Article 6, Section 29 of the Louisiana Constitution. It generally has the power to administer the affairs of the port area, as defined by the Constitution, and to enter into agreements and contracts with third persons in furtherance of the purpose of its creation, subject, of course, to such legal restrictions as might be otherwise applicable under the Constitution and laws of this State.
On September 7, 1955, the Commission entered into a written lease with defendant, Cargill, Incorporated (hereinafter called “Cargill”), under which the Commission leased to Cargill certain public property, including land, a grain elevator and wharf-age for a period of twenty years. In order to construct the grain facility which was the subject of the lease, the Commission issued general obligation bonds of the *153 State of Louisiana. Although the bonds were secured in part by rentals to be paid by Cargill over the term of the lease agreement, they nonetheless constituted an obligation for which the State was primarily responsible. Through this method of public financing, Cargill obtained certain advantages ; it was able to open a grain facility in the lower Mississippi River area without extensive capital outlay, under a plan which resulted in lower interest costs to Cargill on the money borrowed to construct that facility.
In order to insure that Cargill would have first refusal on any additional grain elevator similarly financed and constructed, Paragraph 17 of the lease agreement provided in pertinent part, as follows:
“During the term of this lease Cargill shall have the exclusive right to operate hereunder a public grain elevator within the Port Area as such area is defined by law. In the event said grain elevator is inadequate to properly handle the then existing grain movement through the Port Area and the Port decides to construct additional grain storage and handling facilities, Port must first offer such facilities to Cargill for operation on such terms and for such payments as the Port is prepared to make to responsible third persons in good faith. Cargill must accept or reject such an offer within thirty (30) days; failure by Cargill to notify Port in writing of its election within said thirty (30) days period shall be deemed to be a rejection of said offer. Any modified offer by Port must similarly be first submitted to Cargill and rejected by Cargill before being submitted to third persons.” (Emphasis ours.)
Prior to the institution of this suit, other persons engaged in the transportation, storage and handling of grain had made inquiries of the Commission concerning the possibility of locating a grain elevator in the port area. As a consequence of these inquiries, a dispute arose between the Commission and Cargill as to the interpretation and meaning of Paragraph 17 of the lease agreement, Cargill contending in substance, that the lease vested in Cargill the exclusive right to operate a public grain elevator within the port area and consequently prohibited the Commission from: (a) leasing or otherwise making available to any third party land owned or otherwise controlled by the Commission within the port area for the establishment and operation by any third person of another public grain elevator; and (b) acquiescing in the establishment and operation of another public grain elevator by any third party even on property not owned or otherwise controlled by the Commission, but located within the described port area.
In addition, Cargill contended that even in the event of the attempted establishment and operation of another public grain elevator by any third person on property not owned or otherwise controlled by the Commission, but located within the port area, the lease agreement required the Commission to take such legal steps as might be required to enjoin any such endeavor.
The Commission, in order to resolve the dispute, filed this suit for declaratory relief, contending that Paragraph 17 of the lease agreement did not vest any such exclusive rights in Cargill, but, to the contrary, extended to that lessee merely a right of first option and refusal to lease from the Commission any additional grain storage and handling facilities constructed and financed by the Commission. The Commission further contended that if the lease agreement be construed to grant the exclusive rights urged by Cargill, then the provisions of Paragraph 17 of the agreement must be declared null and void and without force or effect, as amounting to an attempt to take private property without due process and to create an exclusive franchise or privilege contrary to the Constitution and laws of the State of Louisiana.
*154 There is no serious dispute concerning the facts of this case; it was submitted to the Lower Court largely on the basis of depositions previously taken and supporting documentary evidence. The principal issue is a legal one involving the interpretation and meaning of that portion of Paragraph 17 of the lease agreement quoted above.
The Lower Court rendered a declarative decision in favor of the Commission and against Cargill providing as follows:
“(1) That the said Lease executed by and between plaintiff and defendant under date of September 7, 1955, as amended, does not vest in defendant, Cargill, Incorporated, the exclusive right to operate a public grain elevator within the Port Area, as such Port Area is defined by Article VI, Section 29, of the Louisiana Constitution (i. e. the Parishes of East Baton Rouge, West Baton Rouge, Iberville and Ascension, Louisiana).
■“(2) That plaintiff does not have and has never had the legal or constitutional authority to grant any exclusive franchise, privilege or monopoly to operate a public grain elevator.
■“(3) That Plaintiff is not prohibited by the said Lease of September 7, 1955, from leasing or otherwise making available to any third party or parties land owned or otherwise controlled by plaintiff within the Port Area for the establishment and operation thereon by any such third party or parties of a public grain elevator or elevators.
“(4) That the said Lease of September 7, 1955, does not require plaintiff to take any legal or steps to enjoin or prohibit the establishment and operation of public grain-elevators by any third party or parties on property not owned or otherwise controlled by plaintiff, but located within said Port Area.”
With regard to the holding of the Lower Court, Cargill now contends that the Court erred in holding that Cargill does not have the exclusive right to operate a public grain elevator within the port area.
While we do not agree wholeheartedly with the wording of the Lower Court in this regard, we feel that the effect of an interpretation of Paragraph 17 of the lease agreement is, as was decided by the Lower Court, not an exclusive arrangement. To hold that the right was an exclusive one would require that we read out of Paragraph 17 all parts thereof except the first sentence.
This is not permissible, as the law and jurisprudence of this state requires that contracts should be construed so as to give effect to all clauses of the agreement; Civil Code Article 1951; Green v. Southern Furniture Co., La.App., 94 So.2d 508; Bruno v. McCabe, La.App., 71 So.2d 245.
The language of this paragraph of the lease agreement, taken as a whole, is to the effect that no one. but Cargill could operate a grain elevator in the port area with the exception that if the facilities are inadequate and if the Port wishes to construct additional facilities and if Cargill fails to exercise its right of first refusal, then the Commission may construct additional grain facilities and lease such facilities to others. The rights which Cargill, therefore, acquired under Paragraph 17 of the lease agreement was that of first option and refusal of any additional grain facilities as might be constructed by the Commission.
We therefore feel that the Lower Court was correct in holding that the Lease Agreement, as amended, does not vest in the defendant Cargill the exclusive right to operate a public grain elevator within the port area. However, certain provisions must be met by Cargill, which, if lacking would take away its exclusive right/
With regard to the second contention by defendant, i. e., that the Lower Court erred in holding that the Commission does not have the legal authority to grant an exclu *155 sive right to operate a public grain elevator in the Port Area, we must refer to Article VI, Section 29 of the Louisiana Constitution which provides, in part, as follows:
“The Commission shall have authority to make and enter into contracts, leases and other agreements with railroads, trucking companies, barge lines and with any and all companies interested in the transportation, storage and shipping of goods and other products, whether by rail, truck line, barge line, ocean going vessels or otherwise for the use of facilities administered by the Commission or any part or portion thereof, for a period of time not exceeding forty (40) years. No exclusive franchise, however, shall be granted to any carrier.”
The Commission has contended that Cargill is a “carrier” as that term is used in the last sentence of Article VI, Section 29 of the Constitution quoted above. The record discloses that Cargill is the owner of all of the stock of Cargo Carrier, Inc., and that while a substantial portion of this carrier business is derived from Cargill, the record further reflects that approximately thirty per cent of the grain unloaded at Cargill’s facilities is from barges controlled by Cargo Carrier, Inc. Cargill is unquestionably the major factor in the grain business throughout the world and whose interest is the transportation of grain from surplus areas to deficient areas. This same statement, however, could be said of any other major company of this country, such as United States Steel Company and Standard Oil Company, both of whom are interested in the transportation of their respective products from surplus areas to deficient areas. This fact, however, does not make these companies a “carrier” in the normal sense of the word.
In Higginbotham v. Public Belt Railroad Commission, La.App., 181 So. 65, the Court defined the term “carrier” as “one who undertakes to transport persons or property from place to place.” Although Cargill, Inc., is interested in the transportation of goods from place to place just as is any other large corporation, there is no evidence that it “undertakes to transport” grain or any other products or persons from place to place. On the contrary, the record discloses that the contracts with Cargo Carrier, Inc., is on a private basis for the transportation of its product. Even were we to hold that Cargill could be classified as a “carrier” in certain of its operations, and we do not hold such under the cited provisions of the Constitution, there is nothing which would prohibit it from obtaining an exclusive right with respect to its other activities, such as the operation of a public grain elevator, and by such operation having specifically met the lease agreement between parties. The lease agreement requires that Cargill’s elevator as a “public elevator” be required to take grain and storage at published tariff rates from any and all persons, so long as there is capacity in the elevator.
We feel therefore, that under the constitutional provision setting up the Commission, the Commission was given the legal authority to grant an exclusive right to use the facilities administered by the Commission. Otherwise the specific exclusion of this right as regards to “any carrier” would be meaningless.
The Commission, however, contends that even the Legislature cannot confer the authority to grant an exclusive franchise unless it is necessary to serve and protect the public health, morals, safety or welfare as in the case of operating public utility transportation facilities and other functions affecting the general public and subject to regulations under the police power. It states that such legislation would be violative of Section 5 of Art. 13 of the Louisiana Constitution which directs the Legislature to enact general laws to prohibit monopolies, and that it would also violate Section 14 of Art. 19, prohibiting monopolies, or combinations to monopolize trade or commerce.
*156 In making this contention, the Commission cites Talbot v. Louisiana Highway Commission, 159 La. 909, 106 So. 377, in which an exclusive franchise granted by the Louisiana Highway Commission to operate toll bridges was upheld. In so holding, the Court stated that “[a]s a rule such a franchise has no value if it be not exclusive”.
In Stone v. Police Jury of the Parish of Calcasieu, 226 La. 943, 77 So.2d 544, the Court upheld an exclusive franchise at the Lake Charles Airport for limousine service and rentals of automobiles at the airport.
We feel that the Commission under its power “ * * * to construct or acquire, maintain and operate basins, locks, canals, warehouses and elevators; to charge for the use of all facilities administered by it and for all services rendered by it, .such fees, rates, tariffs or other charges as it may establish * * * ” as provided by Article 6, Section 29 of the Louisiana Constitution, would have the power to grant an exclusive franchise except as is specifically restricted in the case of carriers. The lease to Cargill requires that Cargill’s elevators be operated as “public elevators” and, a public elevator is required to take grain for storage at published tariff rates from any and all persons or firms so long as there is capacity in the elevator. In short, access to the Port of Baton Rouge is in no way restricted by the lease agreement.
Cargill further contends that the Lower Court erred in holding that the Port Commission did not have the authority to prohibit the operation of another public grain elevator within the port area or on property controlled by the Port. This case was considered in Lake Providence Port Commission v. Bunge Corp., La.App., 193 So.2d 363, in which it was held that the Lake Providence Port Commission did not have the right to prohibit the construction and operation of a public grain elevator within the area of its jurisdiction on the banks of the Mississippi River between the levees in rural areas. This holding was with regard to- property within the jurisdiction of the Port Commission but owned by private individuals.
The statutory and constitutional authority of the Greater Baton Rouge Port Commission and the Lake Providence Port Commission are identical and we feel that under the holding of the Lake Providence case, in which the Supreme Court refused writs, the Commission cannot prohibit another person from constructing or operating a public grain elevator on private property within the Port area.
Because of the holdings which we have made on the first three questions posed to the Court, the answer to question No. 4 would remain as was decided by the Lower Court. For the reasons hereinabove assigned, the judgment of the Lower Court will be amended to provide as follows:
(1) That the lease executed by and between plaintiff and defendant under date of September 7, 1965, as amended, does not vest in defendant Car-gill, Incorporated, the exclusive right to operate a public grain elevator on property controlled by the Port Commission, however, said lease agreement does vest in defendant the first right of refusal to operate a grain elevator on property controlled by the Port Commission and should the present facilities become inadequate, and should the Port decide to construct additional facilities then, and upon occurrence of these events, the defendant shall have the first option and privilege to lease such facilities.
(2) Petitioner does have the right to grant an exclusive franchise upon property controlled and owned by plaintiff to operate a public grain elevator thereon.
(3) That plaintiff is not prohibited by the said lease of September 7, 1955, from leasing or otherwise making *157 available to any third party or parties land owned or otherwise controlled by plaintiff within the Port Area for the establishment or operation thereon by any third party or parties of a public grain elevator or elevators except that defendant shall have first right of refusal as provided above.
(4) That the said Lease of September 7, 19SS, does not require plaintiff to take any legal or other steps to enjoin or prohibit the establishment and operation of public grain elevators by any third party or parties on property not owned or otherwise controlled by plaintiff, but located within said Port Area.
and as so amended, the judgment of the Lower Court will be affirmed. All costs of this appeal to be paid by the defendant.
Judgment amended and affirmed.