509 So.2d 1002 (1987)
DIXIE ELECTRIC MEMBERSHIP COOPERATIVE
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 86-CA-2331.
Supreme Court of Louisiana.
June 30, 1987.
Rehearing Denied September 3, 1987.
*1003 Marshall B. Brinkley, La. Public Service Com'n, Baton Rouge, Michael R. Fontham, Paul L. Zimmering, Noel J. Darce, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for defendant-appellant.
John Schwab, Schwab & Walter, Baton Rouge, for plaintiff-appellee.
*1004 CALOGERO, Justice[*].
On November 20, 1984, the Louisiana Public Service Commission ordered Dixie Electric Membership Cooperative to refund[1] to its members some $766,842.86,[2] a sum which it had received in 1980 by way of a refund from its wholesale supplier of electricity, Cajun Electric Power Cooperative, Inc.
Dixie Electric filed a "Petition for Appeal and Judicial Review" of the order, in the Nineteenth Judicial District Court. After hearing additional evidence presented by Dixie, the district court, pursuant to La. R.S. 45:1194, ordered the matter remanded to the Louisiana Public Service Commission for reconsideration. Thereafter the Commission affirmed its original Order (U-16281) by ex parte Order U-16281-B. When the matter was returned a second time, the district court reversed the orders of the Commission and enjoined them from implementing and enforcing the two orders. Pursuant to La. Const. art. IV, § 21(E), the Commission has appealed the matter to this Court.
For the reasons which follow we find the refund order to be reasonable and proper and within the ratemaking authority of the Commission. The district court judgment will therefore be reversed, and Orders U-16281 and U-16281-B reinstated.

Facts
Dixie Electric Membership Cooperative,[3] organized under the Louisiana Electric Cooperative Law, was a customer of Cajun Electric Membership Cooperative, which in turn purchased wholesale power from Louisiana Power and Light Co., at the times pertinent to this suit. In 1974, LP & L filed a tariff at the federal level to govern wholesale sales to its customers. LP & L sold electricity to Cajun Electric pursuant to this tariff and Cajun Electric resold electricity to Dixie Electric.[4] The Federal Energy Regulatory Commission ultimately found that the tariff filed by LP & L was excessive and ordered LP & L to refund approximately $4.7 million to Cajun, relating to overcharges during the period October, 1974 through September, 1977. Cajun received this refund in 1978. Of the $4.7 million, $766,842.86 related to overcharges earlier passed on by Cajun to Dixie (and absorbed by Dixie's customers).
During the 1974-1977 period when the overcharges were assessed, Dixie was recovering its purchased power costs through purchase power adjustment clauses, filed with and approved by the Louisiana Public Service Commission. These clauses provided for the flow through to customers of increases and decreases in the average monthly purchase power costs incurred by Dixie. Pursuant to these provisions, the purchase power costs had been passed on to Dixie's customers.
In June, 1980, Cajun Electric refunded $896,020.32 to Dixie, representing the overcharge of $766,842.86 and net interest payment of $129,177.46. The refund was accomplished by issuing to Dixie a credit memorandum for that amount, which reduced Dixie's purchase power bill for the month of June, 1980. Dixie did not thereupon (or at any time thereafter) reduce its *1005 customers' monthly utility bills to reflect the credit. Dixie Electric's purchase power cost for June 1980 was $1,561,417.59. Given a credit of $896,020.32 on that bill, Dixie's net bill was $665,397.27. Thus, Dixie flowed through to its customers in the month of June 1980 the entire purchase power cost,[5] notwithstanding their actual cost for that month had been reduced by the credit.
Pertinent to the issue in this case are the constitutional and statutory provisions relative to the ratemaking jurisdiction of the Louisiana Public Service Commission over electric cooperatives. Under La. Const. of 1921, art. VI, § 4,[6] the Commission was invested with plenary power to "supervise, govern, regulate, and control" specified types of common carriers and public utilities, not including electric cooperatives. That article, however, conferred upon the Legislature the authority to place "other public utilities" under the Commission's authority. Prior to 1970, this Court held that electric cooperatives were not under the regulatory control of the Public Service Commission because the Legislature had not exercised its prerogative to give such regulatory authority to that body. See, for example, Central Louisiana Electric Company v. Louisiana Public Service Commission, 251 La. 532, 205 So.2d 389 (1967).
In 1970, La.R.S. 45:121[7] was amended to include electric cooperatives in the definition of "electric public utility." Also, in that same year, and perhaps simultaneously, La.R.S. 12:426 was amended to place electric cooperatives under the jurisdiction of the Public Service Commission.[8] So, *1006 when the present Louisiana Constitution was adopted in 1974, the Public Service Commission was exercising regulatory control over electric cooperatives. And it was in that historical context that La. Const. art. IV, § 21(B) and its provision for regulation of "all common carriers and public utilities" was adopted:
Powers and Duties. The commission shall regulate all common carriers and public utilities and have such other regulatory authority as provided by law. It shall adopt and enforce reasonable rules, regulations, and procedures necessary for the discharge of its duties, and shall have other powers and perform other duties as provided by law.
(La. Const. 1974 Art. 4, § 21(B).
In 1978, La.R.S. 45:1163,[9] which provides for the regulation of rates and service over public utilities by the Public Service Commission was amended so as specifically to dispense with need for the Commission's approval of the rates of an electric cooperative. However, control over Dixie was regained in October, 1984 when Dixie, pursuant to La.R.S. 12:426,[10] elected to come under the regulatory jurisdiction of the Commission.
Thus, on October 4, 1984 the Public Service Commission, which had ceased regulating the rates charged by Dixie and other electric cooperatives in 1978 following the 1978 amendment to R.S. 45:1163, commenced again regulating the rates charged by Dixie. In the years intervening between 1978 and 1984, the Public Service Commission had not exercised regulatory control over Dixie. And it was during that lapse of regulatory control that Dixie received the disputed refund from Cajun. However, the refund was for power purchased from Cajun by Dixie (and passed on to Dixie's customers) during the years 1974 through 1977 when the Public Service Commission was exercising ratemaking jurisdiction over Dixie. And the disputed orders of the Commission were rendered in 1984 when the Commission clearly had, and was, exercising ratemaking jurisdiction over Dixie.
As was recited earlier in this opinion, the district court reversed the Public Service Commission and ruled in favor of Dixie, specifically finding that the action of the Commission in ordering Dixie to make the refund to its member customers was "arbitrary and capricious." In reaching this conclusion, the district judge emphasized that the Public Service Commission did not have ratemaking jurisdiction over Dixie in 1980, when Dixie received the refund from its wholesale supplier, Cajun Electric.
The Commission first takes the position that it had regulatory authority over Dixie in 1980 notwithstanding the 1978 amendment to La.R.S. 45:1163, and notwithstanding the Commission's having chosen not to regulate electric cooperatives between 1978 and 1984, because that jurisdiction is vested in them by the Constitution ([the Commission] "shall regulate all common carriers and public utilities" La. Const. art. IV, § 21(B); and in 1974 when the present Constitution was adopted, electric cooperatives were by statute public utilities in fact regulated by the Commission).
*1007 While we find persuasive the argument that the Commission's constitutional authority could not have been, and was not, interrupted between 1978 and 1984, we need not make that determination and resolve the issue in this case on that basis, for there is a resolution of the legal dispute which does not require a constitutional interpretation. That resolution follows.
In response to Dixie's contention that the Commission had no ratemaking authority over Dixie in 1980, when Dixie received the refund from Cajun, the Commission argues that the refund was for overcharges made for the years 1974 through 1977 (when the Commission was regulating Dixie). And, furthermore, the 1984 order was based upon "current circumstances and conditions," i.e. those existing in 1984. Dixie's refusal to flow the refund through to its customers was a continuing one, a condition which persisted in 1984, and a condition upon which the Commission could validly base a ratemaking decision, the Commission contends. We agree.
The trial judge was simply wrong when he concluded that the refund order was not "a ratemaking determination based on `current conditions' at that time, November 20, 1984." That money should have been refunded to Dixie's customers, in November, 1984, or at some point in June, 1980, or thereafter. Those funds, refunded to Dixie by Cajun, had earlier been collected from Dixie's customers between 1974 and 1977 on billings in accordance with rates allowed by the Louisiana Public Service Commission. The continuing failure of Dixie to refund this money to its customers (albeit money received by Dixie at a time (1980) when the Public Service Commission was not exercising ratemaking authority over Dixie) is certainly a "current condition," or existing reality which justified the Commission's regulatory orders in the exercise of its plenary ratemaking authority.[11]
In addition to the argument that the Public Service Commission lacked authority to order the refund because it did not have ratemaking jurisdiction over Dixie in 1980, Dixie raises other impediments to the Public Service Commission's order, including that:
1) Dixie handled the 1980 funds in accordance with La.R.S. 12:420.
2) If Dixie had refunded the money to its customers, Dixie would not have met its TIER requirements and would, therefore, have violated its mortgage agreements with the federal government and other lenders.
3) The refund order is barred by prescription.
4) The refund order is a money judgment and the Public Service Commission has no authority to render a money judgment.
For the following reasons we also find none of these additional arguments meritorious.
The orders of the Public Service Commission "are entitled to great weight and are not to be overturned unless shown to be arbitrary, capricious or abusive of its authority." Second, "courts should act slowly in substituting their views for those of the expert body charged with the legislative function of ratemaking, and should not disturb the Commission's decision in the absence of a clear showing of an abuse of power." Gulf States Utilities Co. v. Louisiana Public Service Commission, 364 So.2d 1266, 1268 (La.1978). Finally, decisions of the Public Service Commission should not be disturbed unless "found to be clearly erroneous or unsupported by evidence." Related to this standard of review is the rule that orders of the commission are presumed legal and proper. Also, a controlling rule is that the burden rests on the party attacking the order. Monochem, Inc. v. Louisiana Public Service Commission, 221 So.2d 504, 510 (La.1969).
Dixie contends that it applied the Cajun refund in a manner directed by La. *1008 R.S. 12:420, specifically R.S. 12:420(A)(1) and (2).[12]
Dixie argues that the money it received from Cajun is (or was) used to defray expenses (La.R.S. 12:420(A)(1)) and to pay debt service (La.R.S. 12:420(A)(2)), as a result, the money need not be refunded to its customers. But La.R.S. 12:420 is designed to control the management of cooperatives with regard to its authorized and legitimate revenues. It does not authorize violation of tariffs or over collection of funds. Nor does it affect the obligation of a regulated cooperative to comply with an otherwise legal and proper refund order.
The next argument urged by Dixie Electric is that the refund order violates La.R.S. 12:426(C)[13] because it would drive the TIER of Dixie Electric below the 1.5 level established in its mortgage agreements.[14] Mr. Frank S. Myers, the Director of Finance for Dixie, testified that, had Dixie in 1980 refunded the $896,000 it received from Cajun, its TIER would have fallen to 1.0. Had Dixie been forced to refund the $896,020.32 in 1984, its TIER, projected at 1.7, would have dropped to 1.45, which of course is below the 1.5 benchmark. Similarly, Dixie's TIER, which was projected at 1.56 in 1985, would have dropped to 1.34 had the $896,020.32 been refunded in that year.
R.S. 12:426(C)'s directory provision ("shall set rates [for cooperatives] sufficient to meet the covenants of the cooperative's mortgage and loan agreements") does not prohibit the Commission's refund order in this case.[15]
Furthermore, Dixie did not enter into evidence any loan agreement containing a provision that the failure to maintain a 1.5 TIER was a basis for default. What they did introduce into evidence, rather, was a *1009 Rural Electrification Administration Bulletin which stated as a "General Policy" that the revenues of an electric cooperative should be sufficient to maintain a TIER of 1.5. Furthermore, that bulletin itself at a Section F states:
F. In states where a regulatory commission has jurisdiction over REA borrowers' rates, the commission of the state will, of course, have to be satisfied as to the reasonableness of the borrowers' position with respect to an acceptable rate of return or utility operating margin.
The purpose of the TIER requirement of the REA is to ensure that future revenues of the debtor cooperative will be sufficient to cover its debt obligations. For example, the REA Bulletin states that rates should be set which "will produce the revenue requirements of the system." In this case the rates of Dixie Electric were sufficient to produce a 1.7 TIER in 1984. A one time refund in 1984 would for that year have reduced the TIER, essentially a reflection of the company's performance, but not confiscatorily. And that refund would not in any respect have affected the company's performance after 1984; nor would it have affected the cooperative's ability to meet future debt obligations. As the Public Service Commission's expert testified:
[I]f you looked at the accounting data for let's say the 12 months ending June 30, 1985, and the refund was made then, and I'll first assume that the refund is made as a credit to the customer's bill, and thereby reduces revenues by $896,000 plus interest, in that case the [TIER] for that 12 month period would be affected. But if then you looked again [from] July, 1985 on the [TIER] would be unaffected, so consequently, if the Company posits that it's going to have a [TIER] of let's say 1.7 times without making the refund, but were it to make the refund the [TIER] would drop to 1.2 times, or some other number, that would not impact on its need for additional rate relief. Because prospectively that [TIER] would come right back to the 1.7 prospective, expected basis if that's what its budget would suggest.
Finally, that very TIER requirement of the REA applies only for two of every three years. Knute P. Kurtz, an accountant and expert witness testifying for Dixie Electric, stated that the TIER is only required "in a two out of three year period." The refund order in this case would only reduce Dixie's TIER, at a maximum, for one year. Furthermore, as Mr. Frank Myers conceded, when Dixie in fact fell below the 1.5 TIER level in the successive years 1981 and 1982, the REA simply sent Dixie a letter asking for an explanation of what would be done to improve the TIER. It is our conclusion that the Commission's ordering this refund by Dixie will not place any of its mortgages or loans in jeopardy.
Dixie also argues that Order U-16281-B amounts to an award of a money judgment in favor of their customers, and that the Public Service Commission is without authority to render a money judgment. First of all, the cases cited by Dixie Electric for this proposition address whether the Public Service Commission is the proper forum for a private litigant to institute a private action against a regulated carrier or utility. See Parker Gravel Company, Inc. v. Louisiana Public Service Commission, 182 La. 524, 162 So. 64 (La.1935); Morrison Cafeteria of Louisiana, Inc. v. Louisiana Public Service Commission, 181 La. 932,160 So. 634 (1935); Louisiana Power and Light Company v. White, 302 So.2d 358 (La.App. 4th Cir.1974); Central Louisiana Electric Co. v. Point Coupee Electric Membership Corporation, 182 So.2d 752 (La.App. 2nd Cir.1966). Those cases do not bar the Public Service Commission from promulgating a refund order of general application pursuant to its plenary ratemaking jurisdiction.
Equally without merit is Dixie Electric's argument that the refund order is barred by the one year prescriptive period found in La.R.S. 45:1198. That statute provides:
§ 1198. Violation of commission's order; suits for damages
If the persons mentioned in R.S. 45:1196 as subject to the control of the commission, do not comply with an order *1010 of the commission for the payment of money within the limit fixed in the order, the complainant, or any person for whose benefit the order was made, may file in a court, in the judicial district in which he resides, or in which is located the principal operating office of the carrier, or through which the road or line of the carrier runs, a petition setting forth briefly the causes for which he claims damages, and the order of the commission in the premises. The suit shall proceed in all respects as other civil suits for damages, except that on the trial the finding and order of the commission shall be prima facie evidence of the facts therein stated. If the petitioner prevails finally he shall be allowed a reasonable attorney's fee, to be taxed and collected as part of the costs of the suit. All complaints for the recovery of damages shall be filed with the commission within one year from the time the cause of action accrues, and a petition for the enforcement of an order for the payment of money shall be filed in the court within one year from the date of the order. (Emphasis added.)
Dixie argues that because the refund by Cajun to Dixie was made in June of 1980, the one year prescriptive period began to run at the latest at that time; and thus the Public Service Commission was barred by prescription from issuing the refund order in 1984.
This one year prescription statute is inapplicable in the present situation. It only applies when a person for whose benefit an order is made petitions the Commission claiming damages premised on the utility's non-compliance with the order of the Commission. The prescriptive bar has no application to any time lapse preceding the Commission's action or order. That one year prescriptive period was not intended to deprive the Public Service Commission of the power to initiate its own investigation of a utility's operations and make appropriate regulatory orders.
Although not raised in Dixie's brief, it is appropriate to address two allegations raised in Dixie's petition for review to the Nineteenth Judicial District Court. The petition alleged:
* * * * * *
(b) The Commission's order will require Petitioner to incur debt, i.e., borrow the principal amount of the rebate, $896,020.32, at 12 percent interest by using the short term line of interest with the Jackson Bank for Cooperatives in January, 1985, and through approximately September, 1985, to cover the cost of said refund; such borrowing would cost Petitioner approximately $80,000.00 in interest expense;
(c) The incurrence of the additional debt would cause Petitioner's equity ratio to drop below 20 percent to 9.86 percent.
Neither before the Public Service Commission nor before the district court did Dixie submit evidence to support either of the above allegations. We, therefore, find no need to address them. In all events these allegations alone cannot support a conclusion that the Public Service Commission's refund order was "arbitrary and capricious."

Decree
For the foregoing reasons, the judgment of the district court is reversed and the matter is remanded to the Louisiana Public Service Commission for such action as is consistent with this opinion and with the reinstated orders of the Public Service Commission, Number U-16281 dated November 20, 1984, and Number U-16281-B, dated March 4, 1985.
DISTRICT COURT JUDGMENT REVERSED; REMANDED TO THE LOUISIANA PUBLIC SERVICE COMMISSION.
FORET, J., dissents.
NOTES
[*] Judge J. Burton Foret, participated in this decision as Associate Justice ad hoc in place of Justice Luther F. Cole, recused.
[1] The Public Service Commission ordered Dixie to refund the money through a line item reduction in the power cost adjustment for the month of December, 1984. That is, each customer would receive a credit on his utility bill for that month. The Public Service Commission noted that this procedure would return the overcharges to the customers in the same way as the overcharges were collectedthrough charges on the utility bill.
[2] Plus $129,177.46 of interest.
[3] Unlike an investor owned utility, an electric cooperative is "an association which furnishes [electric] service without entrepeneur profit and which is owned and controlled on a substantially equal basis by those for whom the association is rendering service." I. Packel, The Law of Cooperatives 2 (1956). The customers are members of the cooperative.
[4] Dixie purchased 100% of its power from Cajun at all times pertinent to this litigation.
[5] Apparently the purchase power adjustment clause in effect at the time of the refund from Cajun in June, 1980 was filed with and approved by the Rural Electrical Administration.
[6] La. Const. of 1921, art. VI, § 4 states in pertinent part:

§ 4. Public service commission; powers Section 4. The Commission shall have and exercise all necessary power and authority to supervise, govern, regulate and control all common carrier railroads, street railroads, interurban railroads, steamboats and other water craft, sleeping car, express, telephone, telegraph, gas, electric light, heat and power, water works, common carrier pipelines, canals (except irrigation canals) and other public utilities in the State of Louisiana
* * * * * *
The power, authority, and duties of the Commission shall affect and include all matters and things connected with, concerning, and growing out of the service to be given or rendered by the common carriers and public utilities hereby, or which may hereafter be made subject to supervision, regulation and control by the Commission.... The right of the Legislature to place other public utilities under the control of and confer other powers upon the Louisiana Public Service Commission respecting common carriers and public utilities is hereby declared to be unlimited by any provision of this Constitution.
[7] La.R.S. 45:121 states in relevant part:

The term "electric public utility" as used in this Chapter means any person furnishing electric service within this state, the parish of Orleans excepted, including any electric cooperative transacting business in this state....
[8] Prior to 1970, La.R.S. 12:426 read as follows:

Cooperatives transacting business in this state pursuant to this Part shall be exempt in all regards from the jurisdiction and control of the Public Service Commission of this state. That section was amended by 1970 La. Acts 34,
§ 3 to state:
Cooperatives transacting business in this state pursuant to this part shall be subject to the jurisdiction and control of the Public Service Commission in the same respects as other suppliers of electricity included within the term "electric public utility" as defined in R.S. 45:121, as amended by Acts 1970.
In 1983 by 1983 La. Acts 636, La.R.S. 12:426 was amended once again, no doubt in order to reflect the 1978 amendment to La.R.S. 45:1163, which divested the Louisiana Public Service Commission of jurisdiction over cooperatives. See infra 8 and accompanying text. Also, section 426 was amended in 1983 to allow members of an electric cooperative to elect to come under the jurisdiction of the Louisiana Public Service Commission. That section now states in pertinent part:
Jurisdiction of the Public Service Commission
A. Cooperatives transacting business in this state pursuant to this Part shall not be subject to the jurisdiction and control of the Public Service Commission except as provided in R.S. 45:1163 and Subsections B and C of this Section.
B. (1) Upon petition of not less than ten percent of the members of an electric cooperative, the board of directors of the electric cooperative shall order a referendum election to be held to determine whether the electric cooperative shall be subject to the jurisdiction of the Public Service Commission. A petition shall be completed within sixty days of commencement.
[9] La.R.S. 45:1163 states in pertinent part:

1163. Power to regulate rates and service.
A. The commission shall exercise all necessary power and authority over any street railway, gas, electric light, heat, power, waterworks, or other local public utility for the purpose of fixing and regulating the rates charged or to be charged by and service furnished by such public utilities; however, no aspect of direct sales of natural gas by natural gas producers, natural gas pipeline companies, natural gas distribution companies, or any other person engaging in the direct sale of natural gas to industrial users for fuel or for utilization in any manufacturing process shall be subject to such regulation by the commission. In addition, a schedule of rates of an electric cooperative shall not require approval of the commission if the schedule previously was approved by the board of directors of the electric cooperative and by the federal government or any agency thereof, nor shall the authority of the commission extend to the service rendered by electric cooperatives except to the extent provided in R.S. 45:123 and in orders of the commission promulgated to effectuate the purposes of R.S. 45:123. (Emphasis added.)
[10] In 1983, La.R.S. 12:426 was amended to allow the members of an electric cooperative to vote to come under the jurisdiction of the Commission.
[11] The broad authority of the Louisiana Public Service Commission, stipulated in La. Const. art. 4, § 21(B) included the power to order refunds. See Louisiana Power and Light Co. v. Louisiana Public Service Commission, 377 So.2d 1023 (La.1979).
[12] La.R.S. 12:420 states:

Section 420. Refunds to members
A. Revenues of a cooperative for any fiscal year shall first be used to:
(1) Defray expenses of the cooperative and of the operation and maintenance of its facilities during such fiscal year;
(2) Pay interest and principal obligations of the cooperative coming due in such fiscal year;
(3) Finance, or to provide a reserve for the financing of, the construction or acquisition by the cooperative of additional facilities to the extent determined by the board of directors;
(4) Provide a reasonable reserve for working capital;
(5) Provide a reserve for the payment of indebtedness of the cooperative maturing more than one (1) year after the date of the incurrence of such indebtedness in an amount not less than the total of the interest and payments in respect thereof required to be made during the next following fiscal year; and
(6) Provide a fund for education in cooperation and for the dissemination of information concerning the effective use of electric energy and other services made available by the cooperative.
B. Revenues for any fiscal year in excess of the amount necessary to provide for the items listed in Sub-section A shall, unless otherwise determined by a vote of the board of directors, be distributed by the cooperative to its members as patronage refunds prorated in accordance with the patronage of the cooperative by the respective members paid for during such fiscal year. Nothing herein contained shall be construed to prohibit the payment by a cooperative of all or any part of its indebtedness prior to the date when the same shall become due.
[13] La.R.S. 12:426(C) provides:

When a majority of the members voting vote to place the cooperative under the jurisdiction of the Public Service Commission, the commission shall determine an effective date of the transfer which shall be within ninety days from the election. On and after the effective date of the transfer, the cooperative shall be subject to regulation by the Public Service commission. In fixing and regulating the rates to be charged by an electric cooperative, the commission shall set rates sufficient to meet the covenants of the cooperative's mortgage and loan agreements. Such rates shall not be fixed or regulated on a rate of return basis.
[14] TIER is an acronym for the term "Times Interest Earned Ratio," a ratio which is determined by adding the cooperative's long term interest expense to any profits that the cooperative had at the end of the year and dividing that sum by the cooperative's long term interest expense. In order to have a TIER of at least 1.5, the profits (margin) of a cooperative have to be at least one-half of a cooperative's long term interest expenses.
[15] And for present purposes we assume that such statutory provision does not impinge on the Commission's constitutional regulatory authority.