532 So.2d 1372 (1988)
CAJUN ELECTRIC POWER COOPERATIVE, INC., et al.
v.
The LOUISIANA PUBLIC SERVICE COMMISSION.
No. 88-CA-1719.
Supreme Court of Louisiana.
October 31, 1988.
Rehearing Granted December 15, 1988.
John Schwab, Schwab & Walter, Baton Rouge, James J. Thornton, Johnston & Thornton, Shreveport, W.M. Shaw, Shaw & Shaw, Homer, E. Rudolph McIntyre, Winnsboro, James B. Supple, Darnall, Biggs, Trowbridge, Supple & Cremaldi, Franklin, James J. Davidson, III, Davidson, Meaux, Sonnier & Mcelligott, Lafayette, Wendell Miller, Millican, Miller & Buisson, Jennings, James Funderburk, Duval, Funderburk, Sundbery & Lovell, Hoyma, for plaintiffs-appellants.
Marshall Brinkley, Baton Rouge, Michael R. Fontham, Paul L. Zimmering, Noel J. Darce, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for defendant-appellee.
*1373 WATSON, Justice.
Plaintiffs,[1] nonprofit electric cooperatives, ask for a declaratory judgment on the constitutionality of LSA-R.S. 12:409 G.(3)(a) and (b)[2] which deal with rate fixing and elections for "Any cooperative not under the jurisdiction of the Public Service Commission." Plaintiffs also ask injunctive relief against regulation by the Public Service Commission, except as authorized by LSA-R.S. 45:123[3] and LSA-R.S. 45:1163.[4] In addition, plaintiffs petition for a declaratory judgment as to their rights under LSA-R.S. 12:401, et seq.; LSA-R.S. 45:121, et seq.; and LSA-R.S. 45:1161, et seq. They pray that these laws be decreed constitutional under the 1974 Louisiana Constitution, Art. IV, § 21(B).[5]
The trial court held that plaintiffs are public utilities and therefore within the constitutional jurisdiction of the Public Service Commission over public utilities under Art. IV, § 21(B) of the Louisiana Constitution of 1974. LSA-R.S. 45:1163 was declared unconstitutional insofar as it allows electric cooperatives to exempt themselves from the jurisdiction of the Louisiana Public Service Commission. Plaintiffs' suit was dismissed, and plaintiffs have appealed.[6]
In a separate judgment involving LSA-R. *1374 S. 45:1180 B.,[7] the trial court assessed the cooperatives 90% of the attorneys' fees and expenses certified by the secretary of the Commission and 7/13ths of the remaining 10%.
Plaintiffs are rural electric cooperatives which were established under the Rural Electrification Administration (REA) as authorized by the Rural Electrification Act of 1936.[8]
Ark. Elec. Coop. v. Ark. Pub. Serv. Comm'n, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983) decided that state regulation of electric cooperatives is not barred by the Supremacy and Commerce Clauses of the United States Constitution. Recognizing that the REA could pre-empt state regulation of rural power cooperatives, the United States Supreme Court decided that there is no express preemption. Refusing to draw a bright line between state regulation and unexercised federal power, the court applied a balancing test to find that state regulation of rates is permissible when there is only an incidental effect on interstate commerce. While a particular rate structure might unreasonably disturb the interstate market for electric power, thereby imposing an excessive burden on interstate commerce, the REA may otherwise operate within the constraints of a state regulatory system. Thus, absent compromise of an important federal interest, such as the ability of a cooperative to repay its loans, state regulation may be allowed.
Louisiana Power & L. Co. v. Louisiana Pub. Serv. Com'n, 250 La. 596, 197 So.2d 638, 643 (1967) decided that electric cooperatives were not public utilities per se because: (1) they were not in existence when Act 254 of 1936 defined public utilities; (2) they were specifically excepted from the jurisdiction and control of the Public Service Commission by LSA-R.S. 12:326; and (3) the cooperatives were not included in the definition of public utilities regulated by the Public Service Commission in Act 254 of 1936.
Central La. Elec. Co. v. Louisiana Pub. Serv. Com'n, 251 La. 532, 205 So.2d 389 (1967) held that the 1921 Constitution did not place all "public utilities" under the Public Service Commission. In deciding that an electric cooperative is not an "electric public utility" under that Constitution, the court noted that electric cooperatives were not in existence in 1921. The Central court concluded that Commission customer protection was not necessary in a cooperative operation.[9] Adding additional persuasion was a legislative exemption and the Commission's failure to attempt regulation of the cooperatives for a long period of time.
In a later Central opinion authored by then Justice Barham,[10] this court reaffirmed the holding that electric cooperatives were not "electric public utilities" or "other utilities" placed under the Public Service Commission by the 1921 Constitution. Therefore, the Legislature had the perogative of dictating whether they were subject to Commission jurisdiction.
Although electric cooperatives were not defined as "public utilities" in the Louisiana Constitution of 1921, that Constitution allowed the legislature to place them under the Commission's authority as "other public utilities." Hence, under the 1921 Constitution, the legislature had plenary power to place "other public utilities" under the authority of the Public Service Commission.
Nonprofit electric cooperatives have always been characterized as "Special Corporations" *1375 under LSA-R.S. 12:401 through 430, the Electric Cooperative Law. They were exempted from the jurisdiction of the Public Service Commission at their inception in 1940[11] and remained exempt until 1970.[12]
In 1970, LSA-R.S. 45:121 was amended to include electric cooperatives in the definition of electric public utilities and LSA-R. S. 12:426 was amended to place electric cooperatives under the jurisdiction of the Public Service Commission. Thus, when the 1974 Constitution was adopted, the Public Service Commission had been exercising statutory control over electric cooperatives for four years. Dixie Electric Membership Cooperative v. Louisiana Public Service Commission, 509 So.2d 1002 (La.1987).
The Louisiana Constitution of 1974 went into effect at midnight on December 31, 1974 and delineated the jurisdiction of the Public Service Commission in Art. IV, § 21(B), which states that "the commission shall regulate all common carriers and public utilities and have such other regulatory authority as provided by law." Although electric cooperatives were statutory public utilities when the 1974 Constitution was adopted, Dixie did not decide whether they were "public utilities" under the 1974 Constitution. In fact, the majority in Dixie was careful to note that the decision was "... a resolution of the legal dispute which does not require a constitutional interpretation."[13]
The 1974 constitutional debates indicate that the delegates did not intend to change the Commission's authority. The question then becomes whether the 1974 Constitution placed electric cooperatives under the Public Service Commission as "public utilities" or whether statutory implementation by the legislature was required to give the Commission "other regulatory authority as provided by law" over the cooperatives.[14] The Louisiana legislature adopted the latter interpretation and decided in 1978[15] to exempt the cooperatives from Commission control of rates and service.[16] In 1983, electric cooperatives were given the option of Commission regulation when a majority of the members voted in favor of Commission jurisdiction.[17]
Nonprofit rural electric cooperatives are not public utilities in the broad sense of the term. The legislature recognized this in 1975 when it enacted LSA-R.S. 33:4170[18] which allows municipalities owning revenue producing electrical utilities[19] to contract *1376 with electric public utility companies, other municipalities owning utilities or with Rural Electric Association Cooperatives.
Between September 8, 1978, and September 3, 1987, the Public Service Commission deferred to the legislative intent expressed in LSA-R.S. 45:1163 and other statutes. The Commission then decided to assert authority over the electric cooperatives. An order directing rate and service regulation of the electric cooperatives by the Public Service Commission was issued on September 3, 1987.[20] This suit followed on September 30, 1987. Prior to September 3, the Commission had acceded to the legislation allowing electric cooperatives to choose or refuse Commission regulation.
While rural electric cooperatives are a type of public utility in that they furnish a necessary public service, they are instrumentalities of the United States created by federal law and "something more than public utilities."[21] Being federal creations, rural electric cooperatives should be considered in the context of federal law. REA cooperatives are not "public utilities" under the regulation of the Federal Power Act, even though they "seem to fall within the ambit" of that phrase.[22]
"Though REA regulation and supervision of cooperatives are, in many respects, far more comprehensive than those which the Federal Power Commission exercises over investor-owned utilities, there are certain areas, such as rate-making, where the cooperatives enjoy a freer hand. But it is in these areas that, by their structural nature, the cooperatives are effectively self-regulating. They are completely owned and controlled by their consumer-members, and only consumers can become members. They are nonprofit. Each member has a single vote in the affairs of the cooperative, and service is essentially limited to members. No officer receives a salary for his services and officers and directors are prohibited from engaging in any transactions with the cooperative from which they can earn any profit."[23]
Between 1978 and 1987, the Louisiana Public Service Commission refrained from regulating the electric cooperatives, indicating acquiescence in the Legislature's interpretation of the Commission's authority. Central La. Elec. Co. v. Louisiana Pub. Serv. Com'n, 251 La. 532, 205 So.2d 389 (1967).
Although electric cooperatives have many of the characteristics of public utilities, they are special creations of federal law which come within the regulatory authority of the Public Service Commission only "according to law". Being self-regulated, democratic, and nonprofit, they are not the type of utility which necessarily requires Commission regulation. Salt River Project Agr. Dist. v. Federal Power Commission, 391 F.2d 470 (D.C.Cir.1968), cert. den. 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126.
Approximately one-half of the states impose state regulation on REAs in addition to their federal regulation. This indicates that the necessity of state regulation is a debatable proposition. According to the testimony and exhibits, federal regulation is extensive.
The drafters of the 1974 Louisiana Constitution intended to preserve the existing law whereby public utilities were automatically under the jurisdiction of the Public Service Commission and other utilities, such as the REAs, could be placed under the control of the Public Service Commission at the discretion of the Legislature. The debates indicate no substantive change was intended. The 1974 Constitution allows the Legislature to give the Public Service Commission regulatory authority in *1377 addition to that constitutionally mandated over common carriers and public utilities. This additional authority parallels that granted by the 1921 Constitution. Hence, electric cooperatives can be regulated by the Public Service Commission if authority is granted or, in this instance, withheld, by the Legislature. This is the most reasonable interpretation of the constitutional language, and it validates the many legislative acts potentially affected by this litigation.[24] Legislative enactments have a presumption of constitutionality. Dir. of La. Recovery Dist. v. Taxpayers, 529 So.2d 384 (La.1988).
Since nonprofit electric cooperatives are not public utilities as a matter of law, the legislature has authority to exempt those cooperatives from the authority of the Public Service Commission. The trial court erred in dismissing plaintiffs' suit for a declaratory judgment and injunctive relief and in holding that LSA-R.S. 45:1163 is unconstitutional. Plaintiffs have asked for declaratory judgments as to various statutes pertaining to them. The holding that the Louisiana Public Service Commission may regulate electric cooperatives only as authorized by the Legislature answers the fundamental question as to the Commission's constitutional authority and makes consideration of the separate provisions unnecessary. Likewise, the issuance of an injunction does not appear to be required, although plaintiffs' rights are reserved in this regard.
Not being "public utilities", plaintiffs are not liable for the attorneys' fees and expenses assessed under LSA-R.S. 45:1180.B.
For the foregoing reasons, the judgments of the trial court are reversed.
REVERSED.
COLE, J., concurs to assign additional reasons.
DENNIS and CALOGERO, JJ., dissent with reasons.
LEMMON, J., dissents and assigns reasons.

APPENDIX
LSA-R.S. 45:123 provides:
A. (1) No electric public utility shall construct or extend its facilities or furnish or offer to furnish electric service to any point of connection which at the time of the proposed construction, extension, or service is being served by, or which is not being served but is located within three hundred feet of an electric line of another electric public utility, except with the consent in writing of such other electric public utility. However, nothing contained herein shall preclude:
(a) Any electric public utility from extending service to an applicant for service at an unserved point of connection located within three hundred feet of an existing electric line of such electric public utility, unless:
(i) Such line was not in operation on April 1, 1970, and
(ii) The point of connection is located within three hundred feet of an existing electric line of another electric public utility, which line was in operation on said date, or
(b) Any electric public utility from extending service to its own property or to another electric public utility for resale.
(2) Further, any consumer receiving electric service from a public utility that is subject to the jurisdiction of the Louisiana Public Service Commission who feels aggrieved with the electric service being received by him may apply to the Louisiana Public Service Commission for an order directed to his present supplier to show cause why the consumer should not be released from said supplier, and if the commission shall find that the service rendered to such consumer is inadequate and will not be rendered adequate within a reasonable time the release shall be granted.
B. As used in this Section, `electric line' means a line constructed and operated *1378 for the transmission or distribution or transmission and distribution of electricity, and that was not originally constructed for the principal purpose of preempting territory.
C. Nothing in this Section shall either prohibit or mandate the performance by any parish, municipality, political subdivision, or combination thereof, of any agreement for the sale of electric power executed prior to January 1, 1984, or any renewal of such agreement. Nothing in this Section shall prohibit or mandate in the performance of such agreement the furnishing of service to persons and business organizations being served by another electric public utility.
D. Notwithstanding any other provision of this Section, any municipally-owned or operated utility may furnish or offer to furnish electric service to any point of connection for a retail consumer who is not being served by another utility without the necessity of obtaining the written consent of any other utility if such point of connection is within one mile of such municipality's corporate limits, as such corporate limits of a municipality with more than fifty megawatts of peak load exist on the effective date of this Section and on every third anniversary date of the effective date of this Section, and as such corporate limits of all other municipalities which have fifty megawatts or less of peak load now or in the future exist from time to time.
E. Nothing in R.S. 45:121, 45:123, 45:1161, 45:1175, or R.S. 12:426 shall alter the rights or authority of municipalities with respect to franchises within the corporate limits of a municipality as such limits exist from time to time.
COLE, Justice, concurring.
I am in full agreement with the holding and rationale of Justice Watson's opinion. I write separately only to stress the substantial weight of authority which supports his conclusions.
At the outset, it should be noted the Public Service Commission (P.S.C.) asks us to "discover" a constitutional limitation on the legislature's otherwise plenary power. As we observed in Guillory v. Department of Transportation and Development: "It is a fundamental principle of judicial interpretation of state constitutional law that the legislature is supreme except when specifically restricted by the Constitution." 450 So.2d 1305 at 1308 (La.1984). (citations omitted). In addition, as we observed in Board of Directors of Louisiana Recovery District v. All Taxpayers, Property Owners and Citizens of the State of Louisiana, 529 So.2d 384 (La.1988):
Unless the fundamental rights, privileges and immunities of a person are involved, there is a strong presumption that the Legislature in adopting a statute has acted within its constitutional powers.... The party attacking such a statute has the burden of showing clearly that the legislation is invalid or unconstitutional, and any doubt as to the legislation's constitutionality must be resolved in its favor.... In an attack upon a legislative act as falling within an exception to the Legislature's otherwise plenary power, it is not enough to show that the constitutionality is fairly debatable, but, rather, it must be shown clearly and convincingly that it was the constitutional aim to deny the Legislature the power to enact the statute.

Id. at 387-388 (citations omitted) (emphasis added). The P.S.C. has clearly failed to meet this heavy burden.
From the turbulent history of the debate in the Constitutional Convention surrounding Article IV, § 21(B), one consistent theme emerges: the desire of the delegates to maintain the constitutional status quo. Delegate (now Commissioner) Lambert, speaking in opposition to the Arnette amendment which would delete the phrase "as provided by law," said:
I ask you for a number of reasons to reject this amendment.
The first reason being, the committee worked hard in this particular area in an effort not to make any substantive change basically in that provision. The reason for that was that apparently it had worked fairly well in the past. We *1379 didn't see any particular reason to tamper with it.
IX Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts (Records) at 3008 (105th Days Proceedings; December 20, 1973). In an exchange with Arnette, Lambert added: "What the Committee was trying to do was retain the substantive law in that article." Id.
Even more instructive are several remarks of Delegate Juneau, whose amendment became the current Article IV, § 21(B). In explaining his amendment, he noted: "That is in basis what the present law is...." IX Records at 3346 (117th Days Proceedings; January 14, 1974); "What I'm saying, Woody, is I think that the law ought to be the same as it is today...." Id. at 3347; "[T]he amendment which I proposed is not to make any change whatsoever in the present authority and jurisdiction of the Public Service Commission. Whatever act you may have passed in the legislature relating to the Public Service Commission could be passed in 1975, 1976 or '77.... If you have authority in the legislature to pass an act relating to the Public Service Commission, whatever those acts are today, I think you would have the same authority under this amendment to pass that type of legislation." Id.; "[I]f you want to leave the law as it is today, then I ask you to adopt the amendment." Id. at 3349.[1]
The extant balance of power between the P.S.C. and the Legislature which the delegates sought to preserve had been clearly defined, insofar as electric cooperatives were concerned, by our prior decisions under the analogous provisions of the 1921 constitution.[2] In our decision in Central Louisiana Electric Co. v. Louisiana Public Service Comm'n, 251 La. 532, 205 So.2d 389 (1967), we held electric cooperatives were not subject to P.S.C. regulation under its constitutional grant of authority. Accord, Central Louisiana Electric Co. v. Louisiana Comm'n, 253 La. 553, 218 So.2d 592 (1969). Nor was the decision in Central Louisiana Electric in any way anomalous. In a line of authority stretching back to 1927,[3] this Court consistently refused to limit the Legislature's power to define the regulatory duties of the P.S.C. outside its carefully circumscribed constitutional authority. The prior constitutional provision, the effect of which the delegates sought to adopt, cannot reasonably be said to have been separated from its attendant jurisprudential accretions. Nothing in the pertinent history supports this conclusion.[4] In light of this, one is obliged to conclude Article IV, § 21(B) also excludes electrical cooperatives from the P.S.C.'s constitutionally mandated regulatory jurisdiction. Any extension of the P.S.C.'s authority beyond the constitutional grant can, and should, come only from the Legislature.[5]
Against the weight of constitutional history, statutory and jurisprudential law, and the strong presumption of constitutionality *1380 of Legislative enactments, the P.S.C. offers only its own interpretation of Article IV, § 21, a scrap of dictum in Dixie Electric, and its own notion of how the public welfare is best served which differs from that of the Legislature. This is plainly insufficient to show by "clear and convincing evidence" the acts challenged here are unconstitutional. Absent such a showing, the statutes at issue here must be upheld.
Accordingly, I respectfully concur.
DENNIS, Justice, dissenting.
I respectfully dissent.
The Constitutional Convention debates reflect disagreement among a handful of delegates, but the constitution provision itself signifies an unmistakable intention to vest the Public Service Commission with the constitutional power and the duty to regulate all "common carriers and public utilities" and the ability to receive regulatory authority over other entities as provided by law. The 1974 Constitution provision represents a marked shift in philosophy from the 1921 Constitution's public service commission section. Under the 1921 Constitution, the Commission was granted the constitutional power to regulate only the types of utilities specifically named (e.g., street railroads, interurban railroads, steamboats and other water craft, sleeping car, express, telephone, telegraph, gas, electric light, heat and power, water works....). The Legislature, on the other hand, was accorded the right to determine which other utilities should be placed under the Commission's authority. See Cent. La. Elec. v. Louisiana Public Service Commission, 251 La. 532, 205 So.2d 389 (1967).
The 1974 Constitution, by stating that the "Commission shall regulate all common carriers and public utilities and have such other regulatory authority as provided by law" adopted the prevailing viewpoint in public utilities law. The general rule is that, in the absence of a constitutional provision declaring particular businesses to be public utilities, the question of whether or not a given industry or service is a public utility depends on the nature of the business or service rendered. State Public Com. v. Monarch Refrigerating Co., 267 Ill. 528, 108 N.E. 716 (1915); Aberdeen Cable TV Service v. Aberdeen, 85 S.D. 57, 176 N.W.2d 738 (1970), cert. denied 400 U.S. 991, 91 S.Ct. 455, 27 L.Ed.2d 439. Accordingly, the question whether a particular company or service is a public utility is a judicial one which must be determined by a court of competent jurisdiction. Clear Creek Oil & Gas Co. v. Ft. Smith Spelter Co., 148 Ark. 260, 230 S.W. 897 (1921); Aberdeen Cable TV Service, Inc. v. Aberdeen, supra; Inland Empire Rural Electrification v. Dept. Pub. Serv. Wash, 199 Wash. 527, 92 P.2d 258 (1939); Natatorium Co. v. Erb, 34 Idaho 209, 200 P. 348 (1921); Clarksburg Light Co. v. Pub. Serv. Com., 84 W.Va. 638, 100 S.E. 551 (1919).
Thus the Legislature may not deprive the Public Service Commission of its constitutional power to regulate any public utility, but it may legislatively provide for or repeal the Commission's power to regulate other businesses or enterprises. The mere fact that an industry is affected with the public interest and may be regulated by the Legislature under the state's police power does not give that enterprise the character of a public utility. U.S. v. Cronenweth Dairy Co., 102 F.Supp. 364 (W.D.Pa.1951); Commonwealth, Pub. U. Com. v. WVCH Communications, Inc., 23 P.Commw.Ct. 292, 351 A.2d 328 (1976).
In short, it cannot be determined in a simplistic way whether the 1974 Constitution enhanced or diminished the power of the Public Service Commission. If the business or enterprise in question is determined by the courts to be a public utility because of its inherent characteristics, the Commission has the constitutional power to regulate it. If the business is not by nature a public utility, the Commission does not have such constitutional power, even if the enterprise is of a type listed in the 1921 Constitution, but the enterprise may be placed under the Commission's regulatory authority by law if it is a business affected with the public interest.
The majority opinion seems to base its decision on a confused mixture of two ideas: (1) The 1974 Constitution perpetuated *1381 the classification of electric cooperatives as businesses which are not by nature public utilities but enterprises which may be statutorily subjected to regulation by the Commission; and (2) The 1974 Constitution did not perpetuate this classification but electric cooperatives are held by this court not to be public utilities and therefore not subject to the constitutional regulatory power of the Commission. I disagree strongly with the first idea because it is at odds with the clear wording of the Constitution and denigrates the Constitution by treating it as a sort of statutory law to be interpreted in pari materia with other legislative acts and subservient to legislative construction. As to the second idea, I am uncertain. Whether the electric cooperatives before the court are by nature public utilities as a matter of constitutional law is a complex question dependent upon the nature of each individual business. This question has not been addressed squarely and fully by the court or the parties and I am not certain that the record is sufficiently complete to afford a definitive answer. Consequently, although I am unable to say what the result in this case should be, I necessarily must respectfully dissent.
CALOGERO, Justice, dissenting.
At the time that the Louisiana Constitution of 1974 was adopted, electric cooperatives were statutorily defined as public utilities. La. R.S. 45:121 (1970); La. R.S. 12:246 (1970); Dixie Electric Membership Cooperative v. Louisiana Public Service Commission, 509 So.2d 1002, 1005 (La. 1987).
Article IV, Section 21(B) of the 1974 Constitution gives the Louisiana Public Service Commission exclusive authority to regulate all "public utilities." Because electric cooperatives were statutorily defined as public utilities at the time Art. IV, Sect. 21(B) was adopted, the only logical conclusion is that such cooperatives are covered by the constitutional provision and are subject to the regulatory jurisdiction of the Commission. See Dixie Electric Membership Coop., supra, 509 So.2d at 1007.
There is no contrary indication in the constitutional convention debates regarding Art. IV, Sec. 21(B). In fact, this constitutional provision was opposed by some delegates to the constitutional convention on the ground that it gave the Public Service Commission exclusive regulatory control over all public utilities and common carriers, and did not provide the Legislature with the discretionary power to modify the scope of the Commission's regulatory authority. See Rec. of 1973 Cons. Conv., Tr., Vol IX, p. 3346 (remarks of Mr. Juneau); p. 3347 (remarks of Messers. Juneau & Jenkins); p. 3349 (remarks of Messers. Derbes, Jenkins & DeBlieux). The constitutional provision passed in spite of this opposition. It is thus reasonable to conclude that the delegates understood that this provision would prohibit the Legislature from exempting any class or category of public utility from the Commission's jurisdiction. And, again, electric cooperatives were statutorily classified as public utilities at the time.
Therefore, I would affirm the trial court's ruling that La. R.S. 45:1163 is unconstitutional, to the extent that it attempts to divest the Commission of regulatory jurisdiction over the cooperatives.
For the foregoing reasons, I respectfully dissent.
NOTES
[1] Cajun Electric Power Cooperative, Inc. (Cajun); Southwest Louisiana Electric Membership Corporation (SLEMCO); Claiborne Electric Cooperative, Inc. (Claiborne); Jefferson Davis Electric Cooperative, Inc. (Jeff Davis); Northeast Louisiana Power Cooperatives, Inc. (Northeast); South Louisiana Electric Cooperative Association (SLECA); and Teche Electric Cooperative, Inc. (Teche).
[2] LSA-R.S. 12:409 G. (3)(a) and (b) provide:

"(3)(a) Any cooperative not under the jurisdiction of the Public Service Commission, prior to any change in rates charged for electric energy, shall conduct a public hearing after giving sixty days prior written notice by mail to all cooperative members. The notice may be included in a billing notice but shall be a separate and prominent document. The notice shall contain a brief explanation of the reasons for the effect of the rate increase on consumers and inform the consumers of the availability of a complete, written explanation of the reasons for and the basis of the rate increase. Such written explanation shall be available for examination by any member or his representative at all cooperative offices during regular business hours at least sixty days prior to the hearing.
"(b) At the hearing, the directors of the cooperative shall present evidence in support of the rate change and shall provide the members or their representatives an opportunity to produce evidence regarding the rate change. If the directors of the cooperative fail to implement the rate change within sixty days of the public hearing, they shall conduct another public hearing prior to implementing the rate change. The press shall be admitted to the hearing."
[3] The complete text of LSA-R.S. 45:123 appears as part of an appendix to this opinion.
[4] LSA-R.S. 45:1163 provides:

"A. The commission shall exercise all necessary power and authority over any street railway, gas, electric light, heat, power, waterworks, or other local public utility for the purpose of fixing and regulating the rates charged or to be charged by and service furnished by such public utilities; however, no aspect of direct sales of natural gas by natural gas producers, natural gas pipeline companies, natural gas distribution companies, or any other person engaging in the direct sale of natural gas to industrial users for fuel or for utilization in any manufacturing process shall be subject to such regulation by the commission. In addition, a schedule of rates of an electric cooperative shall not require approval of the commission if the schedule previously was approved by the board of directors of the electric cooperative and by the federal government or any agency thereof, nor shall the authority of the commission extend to the service rendered by electric cooperatives except to the extent provided in R.S. 45:123 and in orders of the commission promulgated to effectuate the purpose of R.S. 45:123.
"B. The commission shall exercise all necessary power and authority over any electric cooperative that, by a vote of its membership, has elected to be regulated by the commission, as provided in R.S. 12:426, for the purpose of fixing and regulating the rates charged or to be charged and services furnished by the cooperative."
[5] LSA-Const. Art. IV, § 21(B) provides:

"(B) Powers and Duties. The commission shall regulate all common carriers and public utilities and have such other regulatory authority as provided by law. It shall adopt and enforce reasonable rules, regulations, and procedures necessary for the discharge of its duties, and shall have other powers and perform other duties as provided by law."
[6] LSA-Const. Art. V, § 5(D).
[7] LSA-R.S. 45:1180 B. provides:

"Attorneys or special counsel may be retained by the commission to assist the economics and rate analysis division for the purpose of evaluating and reviewing matters affecting services and rates charged by public utilities to Louisiana consumers and for representing the Public Service Commission in such cases or the judicial review thereof."
[8] 7 U.S.C.A. 901, et seq.
[9] Greater Livingston Water Co. v. Louisiana P.S. Com'n, 246 La. 273, 164 So.2d 325 (1964), cited with approval in this Central case, had noted the distinction between a utility requiring regulation for the protection of its customers and one subject to elective control.
[10] Central La. Electric Co. v. Louisiana Pub. Serv. Com'n, 253 La. 553, 218 So.2d 592 (1969).
[11] LSA-R.S. 12:426 then provided:

"Cooperatives transacting business in this State pursuant to this Act shall be exempt in all respects from the jurisdiction and control of the Public Service Commission of this State." 1940 La. Acts 266, § 25.
[12] 1970 La. Acts 34, effective July 29, 1970.
[13] 509 So.2d 1002 at 1007.
[14] LSA-Const. 1974, Art. IV, § 21(B) supra.
[15] 1978 La. Acts 77, effective September 8, 1978.
[16] An exception was made for extension and construction of facilities. See LSA-R.S. 45:1163 prior to its 1984 amendment. A caveat required rate approval by the cooperative's board of directors and the federal government.
[17] 1983 La. Acts 636, effective January 1, 1984.
[18] LSA-R.S. 33:4170 states:

"Any one or more municipalities owning and operating a revenue producing electrical utility as defined in R.S. 33:4161 of this Part, is hereby authorized to engage with one or more electric public utility companies as defined in R.S. 45:121, or with any one or more other municipalities owning and operating a revenue producing electrical utility, as aforesaid, or with a Rural Electric Association Cooperative on intrastate or interstate basis, in the financing, construction, maintenance, and operation of joint electric power generation and transmission facilities as owners or otherwise. * * *" Added by 1975 La. Acts 425, § 1.
[19] A "Revenue producing public utility" is defined by LSA-R.S. 33:4161 as follows:

"For the purposes of this Part, `revenue producing public utility' means any revenue producing business or organization which regularly supplies the public with a commodity or service, including electricity, gas, water, ice, ferries, wharehoses, docks, wharves, terminals, airports, transportation, telephone, telegraph, radio, television, drainage, sewerage, garbage disposal, and other like services; or any project or undertaking, including public lands and improvements thereon, owned and operated by a municipal corporation or parish or other political subdivision or taxing district authorized to issue bonds under authority of Section XIV of Article 14 of the Constitution of Louisiana of 1921, from the conduct and operation of which revenue can be derived."
[20] Tr. 35, 36.
[21] Alabama Power Co. v. Alabama Electric Cooperative, Inc., 394 F.2d 672 at 677 (5th Cir. 1968), cert. den. 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465.
[22] Salt River Project Agr. Dist. v. Federal Power Commission, 391 F.2d 470 at 474 (D.C.Cir.1968), cert. den. 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126.
[23] Salt River Project Agr. Dist. v. Federal Power Commission, 391 F.2d 470 at 473.
[24] See, for example: 1975 La. Acts 328; 1976 La. Acts 468; 1982 La. Acts 560, 562, 566; 1984 La. Acts 202.
[1] The delegates' other concern, i.e., that the Legislature could strip away all power from the P.S.C., is inapposite here. Since our ruling simply affirms the P.S.C.'s regulatory jurisdiction as it existed, there has been no diminution of its authority. In other words, the statutes we here uphold do not take any authority from the P.S. C. which it ever actually had.
[2] La. Const., Art. VI, § 4.
[3] New Orleans Pontchartrain Bridge Co. v. Louisiana Public Service Comm'n, 162 La. 874, 111 So. 265 (1927); see also Talbot v. Louisiana Highway Comm'n, 159 La. 909, 106 So. 377 (1925).
[4] The defendant cites no authority, and I could find none, for the notion the delegates sought to do away with the prior jurisprudence limiting P.S.C. authority under the constitution. Indeed, there was no clear statement by any delegate suggesting Art. IV, § 21(B) would or should alter the existing scope of P.S.C. authority under the old constitution.
[5] See Comment, Public Utilities-Jurisdiction of Public Service Commission over Electric Cooperatives, 42 Tulane L.Rev. 434, 442-443 (1968).

Just such an extension was effected by the Legislature between 1970 and 1978. See 1970 La. Acts 34 and 1978 La. Acts 77. Neither this Court nor the P.S.C. is empowered to pass on the wisdom of the decision to re-exempt electric cooperatives from P.S.C. control. One may reasonably conclude, however, the decision of the Legislature in 1978 reflected a considered policy determination recognizing the unique structure and function of rural electrical cooperatives.